STATE OF IOWA, Appellee, v. ERNEST BORWICK, Appellant.

**HOMICIDE:** Murder—Rebuttal of Implied Malice. The presumption
1  of malice from the use of a deadly weapon may be so completely
rebutted by the facts and circumstances of a homicide as to demand
the withdrawal by the court of a charge of murder.

**HOMICIDE:** Excusable or Justifiable—Self-Defense for Guest. A per-
2  son has the same right to defend his guest as he has to defend
himself.

**HOMICIDE:** Excusable or Justifiable—Nonduty to Retreat. A person
3  is under no duty "to retreat" when he is in a place where he has
a right to be, and is, without fault on his part, violently assaulted
by another.

**HOMICIDE:** Excusable or Justifiable—Unarmed Assailant. An as-
4  sault by a *wholly unarmed person* may be made under such circumstances as to justify resistance to the death. So held where the person so assaulted was, at the time, in an automobile, moving along the brink of a steep and dangerous declivity.

HOMICIDE: Excusable or Justifiable—Provoking Encounter. Evidence reviewed, and held insufficient to show that the accused provoked the fatal encounter.

*Appeal from Pottawattamie District Court.*—GEORGE W. CULLISON, Judge.

APRIL 4, 1922.

THE defendant was indicted upon the charge of murder in the second degree for the killing of one Leo Holzfaster. There was a jury trial, and defendant was found guilty of manslaughter. From the judgment entered upon the verdict, the defendant appeals.—*Reversed.*

*Tinley, Mitchell, Pryor, Ross & Mitchell,* for appellant.

· *Ben J. Gibson,* Attorney General, and *John Fletcher,* Assistant Attorney General, for appellee.

WEAVER, J.—On the evening of March 21, 1920, the defendant, Borwick, with one Kost and two young ladies, Miss Howard and Miss Peterson, started from Council Bluffs for an auto ride to Missouri Valley. Borwick and Miss Howard occupied the front seat, and Kost and Miss Peterson the rear seat. On the same evening, and not far from the same time, another auto party was made up for a ride over the same route. In this party Leo Holzfaster was the driver, and he occupied the front seat, with a Miss Hansen, and in the back seat were Donald Clark and another Miss Hansen. The two parties were not acting in concert, and appear to have been entire strangers. It is not quite clear which started first from Council Bluffs, but there is testimony from which it can be inferred that the Holzfaster car was the first out. Whatever be the fact as to the order of the start, it appears to be conceded that, at a point near the town of Loveland, the Borwick car being then in the rear, the driver was desirous of going ahead, and finding the Holzfaster car in his way, made some remark or complaint that the latter was "hogging the road." At about that instant, a pistol shot (some witnesses say two) was fired from the front seat of the

Borwick car. Though all the passengers in the two cars testi-
fied for the State, none was able to say that the shot or shots
were fired at the Holzfaster car or in that direction, and Miss
Howard, who was sitting on the right of Borwick, and in front
of whom it appears the pistol must have been held, if fired
toward the other car, which was then on their right front, says
she did not see it; and, while admitting that the shot was there
fired, says that "it must have been fired to the left." Just then,
Holzfaster pulled a little to one side, and Borwick passed him.
Very shortly, Holzfaster again took the lead, and at a point about
a quarter of a mile from where the shot was fired, he found
one of his tires flat, and stopped apparently to repair it. At
this point, the road is built along the slope of a hill,. there be-
ing a high bank on the east or right-hand side and a declivity
of considerable depth on the left or west side. As the Borwick
car came up in the rear, it slowed down, but, without coming
to a full stop, pulled a little to the left, and passed the standing
Holzfaster car. This brought the Borwick car close to the break
or slope westward from the roadway. As Borwick was executing
this movement, Holzfaster addressed Borwick, demanding, "Are
you the man who shot my tires?" or words to that effect, and,
the question being repeated, Borwick responded, in substance,
"What is it to you?" At that, as said by the lady occupying
the seat with him:

"Mr. Holzfaster sprang like lightning, or quickly, on the
other car. He did not take more than two or three steps. until
he alighted on the running board of the other car."

From his stand on the running board, he began an assault·
upon Borwick. There is no direct evidence that he was armed
with any weapon. Borwick, sitting beneath the steering wheel,
and naturally giving some attention to avoid a plunge down
the declivity with his car and passengers, was in a position of
great disadvantage, and evidently to some extent lost control of
the car, which, as one of the witnesses says, zigzagged a little
distance on the brink, and went over down the steep descent
through the brush and weeds and though the road fence at the
foot of the slope, bringing up in the adjoining alfalfa field. At
some point during this encounter, one or two shots were fired,
and Holzfaster received a fatal wound, dying very soon after-

ward, without making any statement. His body was found in the alfalfa field, thus indicating that he had maintained his hold on the car throughout the fall from the roadway. The shots were heard by several of the witnesses, but no one is able to state where, except that it was during the descent, the shooting was done. Miss Howard was in the front seat when Holzfaster sprang upon the running board, but as they went over the brink, she was either thrown out or fell out or jumped out, and escaped with a few bruises; but she is wholly unable to tell just how it was done—though it is the theory and claim of the defense that she was thrown or knocked out of the car by Holzfaster, to facilitate his assault on Borwick. On the day after the tragedy, an examination of the defendant disclosed several bruises, cuts, and marks of violence on his head, face, and neck, though none of a serious or dangerous character. What we have already said of the absence of evidence to show that the deceased was armed should be qualified by the statement that there is proof that, near where the car landed, at the foot of the hill, there was discovered a wrench, which would make a handy instrument of offense or defense, and that the wrench was one belonging in the Holzfaster car. Its presence there on the scene of the conflict is sought to be explained by the testimony of the witness Clark, who was a member of the Holzfaster party, who says that, after the trouble was over, he himself took the wrench from their car and carried it down into the field where the Borwick car was standing, and that, after seeing Leo's body, he "threw the monkey wrench down there." As to just why he should take the wrench from their own car and cast it on the ground near Borwick's car, and why he did not reveal the somewhat important circumstance at the inquest or to the grand jury, no explanation is offered.

There is very little dispute between witnesses as to the circumstances attending this regrettable affair, but there is enough of confusion and uncertainty to afford room for varying inferences and conclusions of fact, and perhaps a divergence of opinions among lawyers upon the law applicable thereto. As we have already said, the jury found the defendant guilty of manslaughter. The principal errors assigned by appellant as grounds for reversal are as follows:

I. At the close of the State's case in chief, and again at the conclusion of all the testimony, the defendant moved the court to withdraw from the jury both the charge of murder and the

1. HOMICIDE: murder: rebuttal of implied malice.

included charge of manslaughter, because of the insufficiency of the evidence to sustain a conviction thereon. The motion was overruled, and error is assigned thereon. We are inclined to the view that, in so far as relates to the included crime of manslaughter, the trial court did not err in denying the motion; but in our judgment, the evidence would not sustain a conviction of murder. It follows, therefore, that the court erred in submitting that issue to the jury. Our reasons for this view of the record require but little elaboration. Without in any manner excusing or justifying the prior conduct or attitude of the defendant in nagging or irritating the deceased on the drive from Council Bluffs, it is still to be said that, in the fatal affray (if it may be so called), Holzfaster was the aggressor. Defendant was offering him no violence, but was, to all appearances, attempting in a peaceable manner to pass him and proceed on the way with his carload of guests, when deceased, leaving his own car, sprang suddenly upon the running board of defendant's car, and began belaboring the latter over the head, whether with any weapon or with his naked fists is not now particularly material. The space between the Borwick car and the brink of the declivity on that side of the road was narrow, and a plunge over it would be attended with much peril, not only to the defendant, but to those who accompanied him. Cramped as he was by his position under the steering wheel, striving as he naturally must to keep control of the car, and at the same time fend against the attack made upon him, if he did use a deadly weapon (as we must assume he did) to repel his assailant, no just-minded man could draw therefrom an inference of the malice essential to a finding of guilt of murder. The undisputed facts sufficiently rebut the inference or presumption of malice which might otherwise arise from the mere use of a deadly weapon.

II. In several other assignments of error, the appellant

2. HOMICIDE: excusable or justifiable: self-defense for guest.

challenges the correctness of the court's charge to the jury with particular reference to the law of self-defense, as applied to the case made by

the testimony. Bearing upon this question, the appellant requested the court to instruct the jury that:

"The defendant has the same right to exercise the right of self-defense for his companion, Miss Howard, who was sitting in the seat beside him, and the other occupants of the car, to the same extent that he had the right to exercise the right of self-defense in his own behalf. That is, under the circumstances in this case, the defendant had the right, in the defense of the persons of the occupants of the car, to exercise the same right that the persons themselves had, to the right of self-defense."

The request was refused, and no other instruction expressing the same or equivalent proposition was given to the jury. On the contrary, the court charged the jury that:

"To make out that the act of the defendant in killing Holzfaster was justifiable on the ground of self-defense, it must appear from the evidence that, at the time of the killing, Leo Holzfaster was committing an assault upon the defendant, and that such killing was *absolutely necessary to save the life of the defendant*, or to preserve the person of *the defendant* from serious bodily harm from the assault Leo Holzfaster was making upon the defendant. Or it must appear, when viewed from the standpoint of the defendant, as an ordinarily prudent and courageous man would have viewed the circumstances surrounding him and known to him at the time, that, by reason of the assault Holzfaster was then making, the *life of the defendant* was apparently in peril, or *his* person apparently in danger of serious bodily harm, and that the defendant believed, and had reasonable grounds to believe, from the circumstances surrounding him and known to him at the time, that the shooting of Holzfaster was absolutely necessary to avoid such imminent peril to *his life or person.*"

The italics are ours. The same thought in varying forms was emphasized by frequent repetition in other paragraphs, impressing upon the jury the thought that, to justify the killing as an act of self-defense, it must reasonably appear to the person assailed that "it is absolutely necessary to do so, for the preservation of *his own life* or the protection of *his own* person from serious bodily harm." The net effect of the charge as given, and of the refusal to charge that defendant had the same right to de-

fend the safety of the guests in his car that he had to defend himself, was to say to the jury that the peril, if any, in which the guests in the Borwick car were placed by Holzfaster's attack on defendant was an immaterial or irrelevant circumstance, not to be considered as having any legitimate bearing upon defendant's right of self-defense. In this respect, the criticism of the charge is well founded. The principle which recognizes the sacredness of the right of a person to defend his home and household applies in no less degree to the protection to the guest beneath his roof. When he takes his family or friends or guests into his car and drives out upon the public street, we think it no undue stretch of the principle to hold that the car is (in a restricted sense, perhaps), for the time being, his castle; and if, while therein, he is violently attacked, in a manner involving serious danger both to himself and his companions, he has the right to exert himself to the utmost for their common defense and protection. In this case, the peril of being cast with the car down the declivity was common to all the four members of the party, a fall which might readily result in the death or serious injury of them all. Under such conditions, it was the right, if not the duty, of the defendant to act promptly and vigorously to avert the disaster. The right to defend one's self is recognized by statute, as is also the right to resist the commission of a public offense, or to act in aid or defense of one about to be injured by another. See Code Sections 5102, 5104, where it is provided that:

"Lawful resistance to the commission of a public offense may be made by the party about to be injured, *or by others.*" * * * "Any other person, in aid or defense of the person about to be injured, may make resistance sufficient to prevent the same."

The principle is expressly affirmed by this court in *State v. Westfall,* 49 Iowa 328, a case of homicide committed in a fray participated in by several persons. The defendant claimed that the killing was done in self-defense, and the court instructed the jury upon that theory; but, as in the present case, the court refused to charge that the accused could rightfully defend those associated with him to the same extent as he could lawfully do in his own defense. In holding this to be error, we said:

"The court gave certain instructions upon the subject of self-defense, which are correct enough when considered in reference to the defense of defendant's own person. But it cannot be denied that, if the defendant was one of the assailed parties, who were not the aggressors, but stood upon the defensive, he was authorized to defend those associated with him on the same side in the affray against a deadly assault, under well grounded apprehension that their lives were in danger, even to the extent of taking the lives of the assailants. In such a case, the doctrines of the right of defense are not different from those authorizing the defense of one's own person. * * * The defendant asked instructions applicable to this branch of the case, which were refused, and no instructions presenting the doctrine we have stated were given. The instructions asked by defendant upon this branch of the case are probably broader in their scope than is warranted by the law, and should have been to some extent modified. But we think the failure of the court to give instructions presenting the true rule upon this point of the case was prejudicial error."

Mr. Bishop in his work on New Criminal Law (8th Ed.), Section 877, says that:

"Though distinctions have been taken and doubts expressed, the better view plainly is that one may do for another whatever the other may do for himself."

See, also, Desty on Criminal Law, Sections 125, 126, and *Stanley v. Commonwealth,* 86 Ky. 440.

It follows that the trial court erred in refusing to instruct the jury upon the right of the appellant to defend the guests in his car to the extent to which he might lawfully act in his own behalf.

III. The court further instructed the jury as follows:

"It is a rule of law that, where one is assaulted by another, it is the duty of the person thus assaulted to retire to what is 3. HOMICIDE: termed in law a wall or ditch,—that is, as far as excusable or justifiable: non-duty to retreat. he reasonably can,—before he is justified in repelling such assault by taking the life of his assailant, or by inflicting upon him a mortal wound." * * * "Unless it appears from the evidence that the danger to the life or person of the defendant, by reason of the said assault of

Leo Holzfaster, was apparently imminent and unavoidable, when viewed from the standpoint of the defendant as a reasonably prudent and courageous man would judge of the danger when placed under like circumstances, or he was so circumstanced that he could not retreat, or could not retreat without increasing his peril, it was his duty, before taking the life of Leo Holzfaster, to retreat as far as he reasonably could; and if he failed to do so, he cannot justify the killing on the ground of self-defense."

The rule which requires a person assaulted to retreat "to the wall" before he will be justified in using a deadly weapon in his defense is one of ancient origin, and while the rigor of its application which formerly prevailed has been appreciably alleviated in later years, it is still a part of the law of the land. It is not, however, of universal application. If, when the assault is made upon him, the accused already has his back "to the wall," if the assault is of such sudden and vengeful character that he cannot retire without increasing his danger or exposure to death or serious injury, compelling him to instant resistance as the only reasonable means of escape, he is under no obligation of law or reason to make any vain attempt at flight; and when the undisputed testimony discloses such a condition, an instruction upon the duty to retreat should not be given the jury. And such is the situation presented in this record. The assault was made by the deceased very suddenly, without even the preliminary of threat or challenge. It was made while the appellant was in a position in which he could offer little effective physical resistance; the car was zigzagging on the narrow margin of the precipitous bank; the deceased, upon the running board or in the car, towered above him angrily, beating him down, while the car with its load of human freight went over the brink. So far as appears, there never was an instant, from the first move in the attack until the car went off the grade and down through the brush and highway fence into the adjacent field, that appellant had the slightest opportunity to retire from the struggle or to retreat from the attack made upon him. There being manifestly no evidence upon which the jury could properly find the defendant at fault for not retreating from the struggle, the submission to it of the question in the court's charge was

prejudicial. In the case of *Beard v. United States,* 158 U. S. 550, 561, the court, discussing the subject of the duty to retreat, adopts as a fair statement of the law the words of the Ohio court in *Erwin v. State,* 29 Ohio St. 186, 199 *et seq.,* as follows:

"It is true that all authorities agree that the taking of life in defense of one's person cannot be either justified or excused, except on the ground of necessity; and that such necessity must be imminent at the time; and they also agree that no man can avail himself of such necessity if he brings it upon himself. The question, then, is simply this: Does the law hold a man who is violently and feloniously assaulted responsible for having brought such necessity upon himself, on the sole ground that he failed to fly from his assailant when he might have safely done so? The law, out of tenderness for human life and the frailties of human nature, will not permit the taking of it to repel a mere trespass, or even to save life, where the assault is provoked; but a true man, who is without fault, is not obliged to fly from an assailant who, by violence or surprise, maliciously seeks to take his life or do him enormous bodily harm. Now, under the charge below, notwithstanding the defendant may have been without fault, and so assaulted, with the necessity of taking life to save his own upon him, still the jury could not have acquitted, if they found he had failed to do all in his power otherwise to save his own life, or prevent the intended harm, as retreating as far as he could, etc. In this, we think, the law was not correctly stated. The suggestion by the attorney-general that that rule should be declared the law which is best calculated to protect and preserve human life is of great weight, and we can safely say that the rule announced is at least the surest to prevent the occurrence of occasions for taking life; and this, by letting the would-be robber, murderer, ravisher, and such like know that their lives are, in a measure, in the hands of their intended victims."

It also quotes approvingly from the decision in *Runyan v. State,* 57 Ind. 80 (26 Am. Rep. 53, 56), as follows:

"A very brief examination of the American authorities makes it evident that the ancient doctrine, as to the duty of a person assailed to retreat as far as he can, before he is justified in repelling force by force, has been greatly modified in this

country, and has with us a much narrower application than formerly. Indeed, the tendency of the American mind seems to be very strongly against the enforcement of any rule which requires a person to flee when assailed, to avoid chastisement or even to save human life, and that tendency is well illustrated by the recent decisions of our courts, bearing on the general subject of the right of self-defense. The weight of modern authority, in our judgment, establishes the doctrine that, when a person, being without fault and in a place where he has a right to be, is violently assaulted, he may, without retreating, repel force by force; and if, in the reasonable exercise of his right of self-defense, his assailant is killed, he is justifiable.''

It has also been frequently held that a person lawfully on the public highway and there attacked without fault on his part is not bound to retreat, before taking life in self-defense. *State v. Hudspeth,* 150 Mo. 12; *State v. Ballou,* 20 R. I. 607 (40 Atl. 861); *Maiden v. State,* (Miss.) 11 So. 488.

After a liberal citation of the authorities on the question, the annotator of *Young v. State,* 2 L. R. A. (N. S.) 66, says that the rule ''has been arrived at by the courts of a majority of the states by a conclusion that the common-law doctrine of retreat to the wall is not adapted to American conditions, and the adoption of the rule, independently of the common-law doctrine, that a man unlawfully assaulted in a place where he has a right to be, and put in danger, real or apparent, of losing his life, or of receiving great bodily harm, is not required to retreat from his assailant, but may stand his ground and repel force, even to the taking of the life of his assailant, if necessary or in good reason. apparently necessary.''

See, also, *Rowe v. United States,* 164 U. S. 546; Wharton on Criminal Law (10th Ed.), Section 493, page 469; and *State v. Brooks,* 192 Iowa 1107.

Further discussion of the authorities is not required. The defendant, when assaulted, was in no manner interfering with deceased or threatening him with violence. He was where he had a right to be. He was under no obligation to retreat, and his exception to the court's charge in that respect must be sustained.

IV. It is true that the right of defendant to resist an act

amounting to a mere trespass would not, under ordinary circumstances, justify a taking of life, nor would such right exist to

**4. HOMICIDE: excusable or justifiable: unarmed assailant.** so protect himself in an affair of mere fisticuffs. It is also true that there is no direct evidence that the deceased was armed with any weapon of offense when he made the attack. But such attack was confessedly delivered at such a time and place and under such circumstances that its natural and practically inevitable result was to send the car over the embankment, not only to the injury of the car itself, but exposing the defendant and his passengers to serious harm. The attack being wrongful, deceased must be assumed to have intended its probable consequences; and with such danger confronting the defendant, he could lawfully resist the assault with whatever degree of force was reasonably necessary to make his resistance effectual; and this is no less true if the deceased was unarmed. If he was unarmed, there is nothing in the record to indicate that appellant knew that fact; and, as well illustrated in this case, it is entirely possible that an assault even by an unarmed man may be made under circumstances involving peril of a kind and degree which may reasonably justify resistance even to the death of the aggressor.

We have given no prominence in this opinion to the question whether defendant did or did not shoot the tire on the Holzfaster car. There is, we think, no evidence on which that question

**5. HOMICIDE: excusable or justifiable: provoking encounter.** can be answered in the affirmative. It may be conceded that the first firing of the pistol was an act of rowdyism, for which there was no excuse, and that it gave Holzfaster ground for believing that appellant did shoot the tire, and very naturally provoked deceased to anger. It affords an explanation, but not an excuse, for the subsequent assault. After that shot, the parties had both driven a quarter of a mile before deceased discovered the puncture of the tire. There had been no renewal of the quarrel, if it may be so called. Appellant was driving his car along the highway, where he had a right to be, and in an apparently peaceable manner, when deceased left his own car, sprang upon the car of defendant while it was still in motion, and precipitated the fatal struggle. There was no such immediate connection between the firing of the first shot and the subsequent assault upon the

appellant as would justify us in holding that he invited or began the encounter in which the killing was done.

Other questions have been raised by counsel, but as those we have discussed make necessary a reversal, we shall omit their consideration.

For the reasons stated, the judgment appealed from is reversed, and the cause will be remanded for new trial.—*Reversed.*

STEVENS, C. J., PRESTON and DE GRAFF, JJ., concur.