STATE OF IOWA, appellee, v. HAROLD BYRON CHRISTIE, appellant.

No. 47882.

(Reported in 53 N.W.2d 887, 54 N.W.2d 927)

1200

JUNE 10, 1952.

OPINION MODIFIED AND REHEARING DENIED SEPTEMBER 19, 1952.

Verne Lawyer and James McDowell, Jr., both of Des Moines, for appellant.

Robert L. Larson, Attorney General, Raphael R. R. Dvorak, Assistant Attorney General, and Clyde E. Herring, County Attorney, for appellee.

SMITH, J.—On the morning of Friday, June 9, 1950, the body of Vidar Vernon Bergman (age forty-three to forty-five years) was found slumped over in the left front seat of an automobile near the Des Moines River in the city of Des Moines. An autopsy revealed he died as the result of a gunshot wound. The bullet had penetrated the right side of his skull and was lodged on the opposite side just behind the left ear. The facts are not materially in dispute as to the cause of death and there is ample evidence that defendant (age twenty-one years) fired the fatal shot. His own statement to one witness made the afternoon or evening of June 8; his statement to officers June 10 after his arrest, reduced to writing, signed by himself and by three witnesses; and corroborating testimony as to his presence with decedent in the car shortly before the shooting and other circumstances, made the question of his commission of the act at least clearly one for the jury. It is not seriously questioned. The defense instead relies on claimed involuntary intoxication and irresponsibility or insanity due to use of drugs; and to claimed lack of proof of deliberation, premeditation and specific intent to kill. The jury found defendant guilty of first-degree murder and recommended life imprisonment.

Much time was spent at the trial over the admissibility of Exhibit 28, the signed statement referred to above. But it was admitted and no error is predicated upon that ruling. There was some controversy between attorneys as to whether it amounted to a confession. The court submitted it to the jury with an explanation of the conditions necessary to be found to exist before it be considered. No complaint is made of that instruction.

In that statement defendant admitted that on June 5, 1950 (Monday preceding Bergman's death), he broke into a garage and took a 32-caliber nickel-plated, 5-shot revolver; that two days later (Wednesday, the 7th) he met Bergman at a tavern; that they were together all that night; that about 1:30 a.m. Thursday, the 8th, they broke into a drugstore and took a quantity (fifty-six cartons) of cigarettes, two bottles of phenobarbital, a bottle of quinidine sulfate, $9 in change from the cash register, a pair of rubber gloves and a gallon can of Kem Tone, Stratford Green.

He says they then drove around for a time and finally parked on the levee, drank for a time, went to sleep and woke about 9 a.m. They drove around, sold most of the cigarettes and threw the phenobarbital tablets away. (The witness Prine, hereinafter referred to, says defendant was taking phenobarbital tablets when they talked several hours after the shooting.) Bergman bought a pint of whiskey at the liquor store and they drove back to the levee. The rest of the statement discloses defendant's version of the shooting and can best be set out in question-and-answer form:

"Q. After driving back to the levee what did you and Bergman do then? A. He parked there about the middle of the levee which is about one block East of 9th Street on the North side of the river and we sat there drinking. We got to the levee about 1:30 and we sat there drinking until about 2:30. About an hour drinking. And we got into an argument about I had the money on me—all of it—and he wanted me to give one half of it to him right now. I said I would keep it because that way he wouldn't run out on me. So we argued. I had the gun in the glove compartment. I picked it up real quick and when I shot it it was 4 or 5 inches from the right side of his head. Q. Where was Bergman in the car at the time you shot him? A. He was

in the driver's seat. I was sitting on the right-hand side of the front seat. Q. How many times did you shoot him? A. Just once. Q. Is this the same gun that you stole from the Roth garage? A. Yes. Q. After shooting Vidar Bergman what did you do? A. I sat there 5 or 6 more minutes—took a couple more drinks out of the bottle and took the gun with me and walked up the levee towards Southeast 14th Street. I was so drunk I couldn't see which way to go. I saw a guy coming by and asked him which way was to the East Side. I walked with him to East 15th and Walnut at the barbershop. I looked at the clock and it was exactly three o'clock. I got a haircut and a shave and I just walked downtown and I went into Katz Drugstore, bought this T-shirt that I have on now. I went to some restaurant and had something to eat. Then I walked around some more. Then about 6:20 I called Donald Prine and I told him what I did on the phone." (Prine and defendant had been friends since they were in school together at the Iowa Training School for boys at Eldora.)

The statement also says he later met Prine—"I showed him the gun that I used to shoot Bergman." After walking some distance they arrived at the Grand Avenue bridge—"I got to the middle of the north side of the * * * bridge and gave the gun a throw into the river." Prine denied having seen the gun or knowing its whereabouts at time of trial. He testified defendant *told* him he threw the gun off the Grand Avenue bridge.

Defendant's statements to Prine (as testified to by the latter as a witness for the State) do not materially contradict his signed statement. They indicate there was some argument between defendant and decedent but the witness disclaims knowledge of what the argument was about. He said defendant told him Bing (decedent) stuck out his hand like that and said "Well, we are still friends, aren't we?" And Harold (defendant) said "the next thing he knowed he shot him"; also that defendant said "he didn't think he was dead, didn't really realize what he did, and said there was blood running from his ear and that he kind of made a funny noise * * *." The witness testified: "Q. Now did he or did he not say that he was mad at Bing when

he shot Bing? A. Yes, at that time he was, they was in an argument."

Prine's testimony as to his conversation with defendant after the shooting emphasizes defendant's intoxicated condition at that time (several hours after the shooting) and defendant's description of his own condition as to being drunk and confused at the time of and after the shooting. The witness also said defendant told him the shooting was an accident.

In addition to defendant's signed statement and the testimony as to his conversation with Prine, there was testimony of two witnesses who first saw the car parked with two men in it and some time later saw it with but one, lying back "as if asleep", one said, or "slumped over", according to the other. The first witness identified the man on the right, who later was not there, as defendant. There was also the testimony of police officers and the deputy coroner as to details when the body was removed. Defendant argues "the State's case relative to what occurred at the time of the shooting * * * is composed wholly of the defendant's statements * * *." That is not entirely accurate. It disregards the circumstantial evidence in the case above referred to.

▓ I. The distinctions between murder and manslaughter, and between first- and second-degree murder are familiar. Any unlawful killing with malice aforethought is murder. State v. Leib, 198 Iowa 1315, 201 N.W. 29. To constitute murder in the first degree there must be the additional elements of deliberation, premeditation and intent to kill. State v. Sipes, 202 Iowa 173, 209 N.W. 458, 47 A. L. R. 407; Fouts v. The State, 4 (G. Greene) Iowa 500.

▓▓ Defendant contends the court erred in submitting the question of first-degree murder and also in failing to sustain motion for directed verdict as to second-degree. The argument concedes that "proof of intentional homicide without circumstances of mitigation or excuse affords the presumption of malice and therefore of murder" but insists "that presumption is of murder in the second and not the first degree." The argument then proceeds: "We are permitted to say that one who shoots and kills another intended the fatal result" but we may not go

further and say that having thus found the intent we may therefrom draw the inference of deliberation and premeditation. Numerous·cases are cited. None seems to involve sufficiency of the evidence to warrant submission of a charge of murder except State v. Wilson, 234 Iowa 60, 11 N.W.2d 737, State v. Leib, supra, and State v. Borwick, 193 Iowa 639, 187 N.W. 460. The others are either not murder cases at all or were decided on errors not including insufficiency of the evidence to go to the jury.

The errors assigned on this proposition do not complain of the instructions. The contention is that neither first- nor second-degree murder should have been submitted.

In the Leib case (supra) we held there was insufficient evidence to warrant submission to the jury of the issue of first-degree murder. True, the opinion points out (page 1321 of 198 Iowa) that "the fact of the killing and the manner in which it was done come wholly from the lips of appellant." But that is not assigned as the reason for the ruling. Defendant's statement in that case was to the effect that the men were fighting, that they "tussled for possession of a shotgun and that the gun went off and appellant struck [decedent] over the head with the gun barrel." There was evidence the men had been drinking. There is nothing here to indicate violence, actual or threatened, on Bergman's part.

In the Borwick case (supra) circumstances were entirely different and quite complicated. It was held (page 643 of 193 Iowa) the undisputed facts were such as to "rebut the inference or presumption of malice which might otherwise arise from the mere use of a deadly weapon." Without stating those facts in detail we may say they showed decedent was making an unwarranted attack on defendant under such circumstances as to justify the shooting. There is of course nothing of that sort in this record.

Clearly those cases are not controlling here. The same may be said of other murder cases cited. State v. Phillips, 118 Iowa 660, 677, 92 N.W. 876, 881, was reversed because of erroneous instructions. One concerned the subject of premeditation and deliberation in which the trial court erroneously instructed in effect that the aiming and firing of a gun with fatal effect is

"of itself" evidence of an intent to kill and "therefore of a wilful, deliberate and premeditated killing." The opinion says this would make one inference the basis of another, "a violation of the fundamental principles of evidence."

In State v. Wilson, 234 Iowa 60, 92, 11 N.W.2d 737, 753, it was held the charges of both first- and second-degree murder should have been withdrawn from the jury. The opinion points out, among many other things, that defendant and decedent were engaged in a fight and there was "uncontradicted evidence that Bolden [decedent] picked up a club and stated he was going to knock the appellant's head off and that he attempted to do so." Death in that case was caused by a blow with a club. The court held the evidence insufficient to show beyond a reasonable doubt the existence of the elements necessary to constitute either first- or second-degree murder. The facts reviewed in the opinion are too numerous and complicated for further review but the case bears no resemblance to the instant case in fact or principle.

We think the evidence here compelled submission to the jury of the charge of first-degree murder and of course that of second-degree. The contention of defendant on this point seems to rest on two propositions—that there was no time shown for deliberation and premeditation, and that the evidence showed such intoxication as to negative premeditation, deliberation and specific intent to kill.

As to the first, we have repeatedly said in effect that the essential premeditation need not be of long duration. See e.g. State v. Hofer, 238 Iowa 820, 834, 28 N.W.2d 475, and cases there cited. And under defendant's own statements there is no conclusive showing that his act was due to any sudden decision or impulse. Under it the intent may or may not have been formed suddenly. That was for the jury to determine. The men were quarreling, defendant was angry, and though Bergman stuck out his hand and said "Well, we are still friends, aren't we?" and though there was no physical encounter or violence threatened or sudden development to account for his act, defendant, who had the gun lying in front of himself in the open glove compartment of the car, picked it up "real quick" and shot

decedent with the gun "4 or 5 inches from the right side of his head."

We cannot hold under these facts that it was the duty of the trial court to withdraw the charge of either first- or second-degree murder. The State's brief quotes from State v. Powell, 237 Iowa 1227, 1238, 24 N.W.2d 769, 775, the following language we deem applicable here:

"The other elements of premeditation and deliberation are likewise provable by the facts and circumstances surrounding the homicide. We have said premeditation and deliberation need not exist for any particular length of time. State v. Fuller, 125 Iowa 212, 100 N.W. 1114; State v. McPherson, 114 Iowa 492, 87 N.W. 421; State v. Woodmansee, 212 Iowa 596, 233 N.W. 725; State v. Baker, 143 Iowa 224, 229, 230, 121 N.W. 1028, 1030. In the last cited case we said:

" 'This court has never held that the trial judge could be required by motion to enter into a critical examination of the evidence, where the proof tended to show homicide by violence, with malice aforethought, for the purpose of determining whether in his opinion the act was deliberate and premeditated. There might perhaps be cases where the circumstances of the homicide were such as that the court could say, as a matter of law, that there was no evidence of deliberation and premeditation, but such cases would be exceptional. Where the defendant has selected a deadly weapon, and with opportunity to deliberate has intentionally used it in a deadly manner, it would not, we think, be proper for the court to take the question of deliberation and premeditation from the jury. That under such circumstances it is proper to submit the question of first degree to the jury, although there is no specific proof of deliberation and premeditation, apart from the proof of the violent infliction of a mortal wound, has been affirmed by this court on several occasions.' "

In State v. Heinz, 223 Iowa 1241, 1258, 1259, 275 N.W. 10, 12, 114 A. L. R. 959, similar language is used: "* * * the deliberate, violent use of a deadly weapon * * * with opportunity to deliberate is evidence of malice, deliberation, premeditation, and intent to kill."

This is not making one inference the basis of another as

in State v. Phillips, supra. It is instead recognition of the fact that deliberation, premeditation and specific intent to kill, as is true of mental processes generally, are not ordinarily susceptible of direct proof but must be deduced from conduct and the circumstances accompanying it.

 II. But it is contended the record required the trial court to withdraw both charges of first- and second-degree murder because of defendant's intoxicated condition when he fired the fatal shot. We cannot agree. That was for the jury to determine.

The burden of proof on a defense of intoxication is on defendant in a criminal case. State v. Wilson, supra, 234 Iowa at page 77, and cases there cited. The showing here is not sufficient to convert the issue from one of fact to one of law. Defendant himself did not testify, except in the hearing on the admissibility of his signed statement.

In his signed statement, which was a transcription of notes taken down stenographically in question-and-answer form, he says: "I was so drunk I couldn't see which way to go." This referred to some uncertain length of time after the shooting. He says "I sat there 5 or 6 minutes [after the shooting], took a couple more drinks out of the bottle and took the gun with me and walked up the levee." He also looked at the clock and noted —and remembered—"it was exactly three o'clock." He says he got a haircut and shave, bought a shirt ("I have on now"), had something to eat and "about 6:20" called Donald Prine. He remembered that when he got to the "middle of the north side of the Grand Avenue bridge" he threw the gun into the river.

The first witness who testified she saw the two men sitting in the car before the shooting later testified, as a defense witness, that both men were intoxicated. Witness Prine said when defendant called him over the telephone that evening to arrange a later meeting he could tell he was intoxicated. The same witness, throughout his testimony, injects his own opinion as to defendant's mental condition.

But it was for the jury to determine, under appropriate instructions, whether defendant's intoxication when he committed the act was such as to preclude a finding of premeditation, de-

liberation and specific intent to kill. Mere intoxication was not sufficient. State v. Wilson, supra, 234 Iowa at page 76. No complaint is made on appeal as to the instructions given on this subject.

III. Defendant attempted to prove that on the evening of June 7 decedent was buying the beer the two men were drinking. When objection was made the purpose was stated to be "to show that Harold Christie was so coerced into drinking by * * * Vidar Bergman."

An instruction was asked by defendant and refused by the court submitting the defense that the shooting may have been due to involuntary intoxication upon liquor furnished by "or at the request or solicitation of" Bergman under a relationship between the men "caused by their difference in ages, experience, dominance of personality and power of persuasion and that the defendant became intoxicated due to that relationship and by coercion and persuasion of deceased."

There is no evidence and there was no offer of proof to sustain a defense of involuntary intoxication. The mere fact that the liquor was furnished by decedent on a particular occasion would not tend to show the intoxication was not voluntary. State v. Sopher, 70 Iowa 494, 498, 30 N.W. 917. There is no proof or offer of proof of any such relationship between defendant and Bergman mentioned in the requested instruction. The cases cited by defendant to the effect that defendant in a criminal case has the right to bring in evidence of this theory of defense have no pertinency here under the record.

IV. It is argued the court erred by not including in the instructions defining first- and second-degree murder and the proof necessary to establish same the substance of later instructions relating to the defense of intoxication. It is conceded that later instructions embodied the applicable law on that defense. The point was not raised below.

There are two ready and conclusive answers to this contention: (1) All the rules on the subject of the alleged crime need not be included in a single instruction, Deere v. Wolf, 77 Iowa 115, 119, 41 N.W. 588. (2) Intoxication being a defense upon which defendant had the burden of proof, instructions concern-

ing it had no place in an instruction defining the alleged crime and the elements necessary to be proven to establish it. "It is not practical to give all the law in one instruction; the instructions must be considered together." State v. Ockij, 165 Iowa 237, 248, 145 N.W. 486, 491.

V. It is urged the trial court erred in admitting a bullet in evidence without sufficient evidence as to its identity as being the one taken from decedent's head; and in permitting the introduction of certain bloodstained articles over the objection they were "inflammatory, prejudicial and contributed nothing but passion and prejudice to the case" and "did not tend to prove or disprove any issue in the case."

The bullet was identified by the surgeon who removed it from decedent's head and by the identification expert who was present when it was removed. We hardly see how proof as to its custody in the meantime could add to its identification.

As to the bloodstained articles, they were a proper part of the circumstantial evidence connected with the case and admissible as such. State v. Stansberry, 182 Iowa 908, 912 et seq., 166 N.W. 359; State v. Griffin, 218 Iowa 1301, 1311, 254 N.W. 841; State v. Jones, 233 Iowa 843, 848, 10 N.W.2d 526. We agree with the statement in State v. Stansberry, supra (182 Iowa at page 917), that "something must be left to the discretion of the trial judge, who has the entire situation before him, and who is best qualified to give due consideration to the entire situation existing when the offer is made and the objections interposed. What is really involved * * * is whether judicial discretion has been abused."

We think there was no such abuse here. There is no complaint that any improper emphasis upon or use of the exhibits was made, calculated to arouse prejudice or inflame the passions of the members of the jury.

VI. Error is assigned on the ruling permitting the prosecuting attorney to interrogate the witness Prine as to his own possible possession of the gun he had testified defendant claimed to have thrown into the river. Nothing came of the inquiry and we think there was no abuse of the court's discretion. Withey v. The Fowler Co., 164 Iowa 377, 382, 145 N.W. 923,

925; State v. Hiatt, 231 Iowa 643, 654, 1 N.W.2d 736.

Complaint is also made of the court's ruling sustaining objection to defense counsel's argument to the jury that the State, by offering Prine's testimony, vouched for and assumed the truth of it.

The abstract rule is that one cannot *impeach* his own witness. Only in that sense is the testimony "binding" on him. State v. Burzette, 208 Iowa 818, 828, 222 N.W. 394. It may be admitted the prosecuting attorney here may have been in technical violation of the rule in a part of what he said when he argued Prine testified untruthfully that defendant told him the shooting was an *accident*. There is no testimony or showing that defendant did *not* tell Prine that. But that was not the real question. What the jury wanted to know was whether the shooting *was* in fact accidental.

That called for a conclusion which the jury would have to determine from the facts. Defendant's version of the facts was before the jury. Whether he told Prine the shooting was accidental was after all immaterial. The error of the prosecutor was, we think, not prejudicial.

A study of the whole record persuades us there was no reversible error and that defendant had a fair trial. The judgment is affirmed.—Affirmed.

All JUSTICES concur.