STATE OF IOWA, appellee, v. LEON ROBERT TICE, JR., appellant.

No. 51400.

(Reported in 130 N.W.2d 678)

OCTOBER 20, 1964.

REHEARING DENIED DECEMBER 15, 1964.

Ross F. Caniglia, of Council Bluffs, for appellant.

Evan L. Hultman, Attorney General, William J. Yost, Assistant Attorney General, Noran L. Davis, County Attorney of Pottawattamie County, and John P. Churchman, Assistant County Attorney, for appellee.

LARSON, J.—On July 18, 1963, the defendant Leon Tice, Jr. was charged by indictment of "willfully, deliberately and premeditatedly, with malice aforethought" killing Judith Jackson on June 21, 1963, in violation of section 690.2, Code of Iowa, 1962. He was arraigned July 23, 1963, counsel was appointed for him at his request, and a plea of not guilty was entered. Trial to jury on September 17, 1963, resulted in a verdict of guilty with direction that he be punished by death. Motion for a new trial was overruled on September 27, 1963, and defendant was sentenced to die in the manner prescribed by law, at the state penitentiary in Fort Madison, Iowa, on the 12th of November, 1964. He appeals.

 I. Appellant's first assignment of error is that the evidence does not sustain a finding of murder in the first degree and the court erred in failing to dismiss the first-degree charge. We find no merit in this assignment.

Section 690.4 of the 1962 Code provides in part: "Upon the trial of an indictment for murder, the jury, if it finds the defendant guilty, must inquire, and by its verdict ascertain and determine the degree; * * *."

There seems to have been no dispute as to material facts. Defendant did not testify.

Irene Jackson, mother of Joan Burtness and 13-year-old Judith Jackson, became acquainted with Leon Tice, Jr. on June 10, 1963, at their residence at 4047 Avenue G in Council Bluffs, Iowa. Joan Burtness, estranged from her husband, had been seeing defendant and, with financial aid from Tice, was to get a divorce and marry him. However, on June 19, 1963, Joan decided to remain with her husband and so advised defendant. Although he tried hard to dissuade her and even cried, Joan would not see him again. On the evening of June 20, 1963, defendant appeared at their residence carrying a gun, cursing, and threatening to kill Joan's husband. It appeared defendant had borrowed this gun, a German Walther which did not fire when tested, and he returned it the next evening, June 21. In the meantime he had purchased a .22-caliber nine-shell Harrison Richard revolver, Serial #U-17594 (Exhibit 9), at Dave's Sporting Goods in Omaha, Nebraska. He told a neighbor he had quit his job, showed him the gun, and left his place about 6:10 p.m. June 21. Soon thereafter he appeared at the Jackson-Burtness residence, and for some two and one-half to three hours engaged Mrs. Jackson in conversation through a locked screen door. When he produced a gun, Mrs. Jackson again attempted to talk him out of his avowed purpose of shooting Joan's husband and, when he said to her, "You're right, Irene. You want this gun.", she thought she had succeeded. However, when she unlocked the screen to take the gun defendant shoved the gun into her stomach and forced her back into the dining room. When the 13-year-old Judith Jackson tried to go out the back door he forced her back to the kitchen doorway. The two infant sons of Joan were asleep in their beds at the time and no one else was home. When Mrs. Jackson told him not to point the gun at Judith he shot Mrs. Jackson in the side, turned the gun back on Judith, and, in spite of her plea "Junior please, for God, don't", shot her twice. She fell on the dining room floor, and Mrs. Jackson ran. He pursued her outside the house, shot her in the back and then again as she tried to get over a fence. Tice then returned to the house and shot Judith again and both the boys as they lay in their beds. Randy, the two-year-old boy, was dead when help arrived. The wounded were taken to the hospital where Judith died.

Defendant then went to his parents' home and, when police arrived, shot himself in the head. The wound was not serious and he soon recovered. The gun and the spent and unspent shells were introduced in evidence, although due to some mutilation the bullet recovered from Judith's body could not be identified as having come from this particular gun.

Police officers testified Tice told them he had been jilted by a young lady, and the reason he had shot the children was to get even with her and her husband. On June 22, 1963, after being advised of his constitutional rights, he gave a statement to Captain Merriman of the Council Bluffs police department in the presence of two other officers. The captain testified Tice was reluctant at first, stating he had a headache, but as they visited he voluntarily began to talk. Notes were taken and a statement prepared for Tice's signature. However, he postponed signing the statement and later on advice of counsel refused to do so. In testifying from his notes, Exhibit 14, the captain related the substance of that interview. Tice told where he met Mrs. Burtness, of her action for divorce, where and when he bought the gun, and why he had done all the shooting. Tice said, "I was hurt and wanted to hurt her, didn't intend to use a gun on anyone particularly, but thought of using it on myself." He said he knew Joan loved her mother and sister and thought this would be a good way to get at Joan. He said he had to reload the gun once during the affray. He denied it was a case of ill temper, but said "I would do it again." He said Joan and he had planned a perfect marriage, that he had borrowed $200 to help her secure her divorce. He had stopped drinking after meeting Joan, although he had consumed twelve bottles of beer during the day of the shooting. He said he was not drunk, just "fortified", but also said if he had been sober, "I would probably got her old man also." He also told the captain that Joan told him on the phone she still loved him "but was going back to her husband on account of the boys." He said she refused to see him and "I told her that they would regret this." Tice also said Joan's husband had threatened to shoot him once, that he had been married twice, and had made it about halfway through the tenth grade at Eldora. He stated he shot the mother first, and later as she ran

out the door shot her again and two more times at point-blank. Judith was shot two or three times and lay on the dining room floor. When he came back into the house he reloaded the gun, fired again at Judy point-blank, and went into the bedroom. Billy woke up and Tice said he fired one shot at him and another at Randy as he stood over the bed. Then he went home and, as the police came, he went into the bedroom, placed the gun to his head and pulled the trigger. He said he was conscious when being taken to the hospital. He had no military service due to other troubles which had him incarcerated at Eldora and Anamosa. There was no objection to this testimony and no denial of the officer's statement that Tice had been advised of his constitutional rights.

There was other testimony by neighbors and officers called to the scene covering the same facts, but we think this sufficient to disclose overwhelming evidence from which a jury could find a willful, deliberate and premeditated killing with malice aforethought. That defendant fatally shot Judith Jackson is not denied.

II. It is appellant's position that the evidence showed no more than murder in the second degree, for it does not appear that Tice threatened anyone other than Joan's husband, and that he was armed because he feared meeting Mr. Burtness at the Jackson residence when he tried to see Joan. It is his contention that he shot those he liked and to whom he bore no ill will without premeditation. This argument was for the jury and it did not believe that explanation, but found the killing had been done deliberately, premeditatedly and with the intent to kill. The evidence fully sustains that finding.

In State v. Haffa, 246 Iowa 1275, 1291, 71 N.W.2d 35, we said any unlawful killing with malice aforethought is murder, and to constitute first-degree murder there must be the additional elements of deliberation, premeditation and intent to kill. Also see State v. Jackson, 251 Iowa 537, 545, 101 N.W.2d 731; State v. Nutter, 248 Iowa 772, 778, 81 N.W.2d 20, 23; State v. Christie, 243 Iowa 1199, 53 N.W.2d 887, 54 N.W.2d 927; State v. Leib, 198 Iowa 1315, 1323, 201 N.W. 29. Malice, of course, means that condition of the mind which prompts one to do a

wrongful act intentionally without legal justification or excuse. State v. Nutter, supra, and citations.

We have also often stated that premeditation and deliberation need not exist for any particular period of time prior to the killing. The rule we stated in State v. Heinz, 223 Iowa 1241, 1258, 1259, 275 N.W. 10, 20, 114 A. L. R. 959, is as follows: "* * * the deliberate, violent use of a deadly weapon or an instrument likely to cause death with opportunity to deliberate is evidence of malice, deliberation, premeditation, and intent to kill."

In State v. Baker, 143 Iowa 224, 230, 121 N.W. 1028, 1030, we said: "Where the defendant has selected a deadly weapon, and with opportunity to deliberate has intentionally used it in a deadly manner, it would not, we think, be proper for the court to take the question of deliberation and premeditation from the jury. That under such circumstances it is proper to submit the question of first degree to the jury, * * *."

It might well have been said in the case now before us. The record here disclosed the purchase of a new gun a few hours before the shooting, a conversation with Mrs. Jackson of some two and one-half to three hours before she opened the door to get promised possession of the weapon, and an entreaty by both Judith and Mrs. Jackson before Tice opened fire upon them. These facts clearly show a sufficient time for deliberation, premeditation and the formation of an intent to kill, even if the later statements as to his intent and purpose were not considered. Also see State v. Woodmansee, 212 Iowa 596, 233 N.W. 725; State v. Christie, supra; State v. Kelley, 253 Iowa 1314, 1322, 1323, 115 N.W.2d 184; State v. Jackson, 251 Iowa 537, 545, 101 N.W.2d 731, 736.

III. Appellant's second assignment of error is also without merit. He contends it was reversible error for the trial court to permit the county attorney and his assistant to split the opening arguments for the State. The rule is well settled in this and most jurisdictions that such matters are peculiarly within the sound discretion and power of the trial judge, who is in a position to see and hear all that takes place in the trial. State v. Dale, 225 Iowa 1254, 282 N.W. 715, and citations; State v.

Martin, 199 Iowa 643, 648, 200 N.W. 213. The appellate courts will not as a rule interfere in such matters unless it appears that this discretion has been so abused that the prejudicial effect is to deprive defendant of a fair trial. Here there is no such showing or no such claim. Section 780.6, Code, 1962, referred to by appellant, does not prohibit the splitting of arguments or restrict the trial court's discretion in such matters.

Section 780.6 provides: "When the evidence is concluded * * *, the county attorney must commence, the defendant follow by one or two counsel, at his option, unless the court permit him to be heard by a larger number, and the county attorney conclude, confining himself to a *response* to the arguments of the defendant's counsel. Where two or more defendants are on trial for the same offense, they may be heard by one counsel each." (Emphasis supplied.)

There are no restrictions in this statute except that the *response* must be to arguments of defendant's counsel. Nothing is said as to the personnel of the county attorney's office, and we can see no cause to restrict the trial court's necessary discretion in proceedings of this nature.

In Anizan v. Paquette, 113 S.W.2d 196, 200, the Texas Court of Civil Appeals, in construing a similar statute, stated: "This rule obviously does not prohibit an opening argument from being made by two different attorneys for a plaintiff."

In Potapoff v. Mattes, 130 Cal. App. 421, 426, 19 P.2d 1016, 1018, the California Supreme Court also considered a similar statute and remarked: " 'The number of attorneys who may address the jury on either side is within the discretion of the trial court'." Also see 38 Cyc. 1473.

Here there was absolutely no showing of any prejudice to defendant by permitting the splitting of the State's opening argument, and in the absence thereof we must hold no error was committed thereby.

■ IV. In performing our duty to fully examine the record for any reversible error in such matters, we find in defendant's motion for a new trial an allegation that the court erred in permitting the jury, when considering the punishment as a part of the verdict, to consider the possibilities of parole from a sen-

tence of life imprisonment. It is true the jury asked the court for further instructions after the case had been submitted, wanting to know "if we found the defendant guilty of murder in the first degree and directed that he be punished by imprisonment for life—if this sentence could at anytime be commuted and he would be eligible for parole." The trial court told the jury: "* * * I cannot answer the question fully or directly. You have the right to assume that any verdict returned by you will be carried out." The court then told the jury it could make recommendations after it had reached its verdict. Obviously the jury was concerned with the possibility of defendant's release at some future date and did not believe he should have the chance to kill again. The implication is that if he would really be restrained of his liberty for life they would not direct the death penalty, pointing up perhaps the idea that in some cases parole should not be permitted. However, we cannot speculate as to the reasons for the jury direction and note there is no contention the verdict was improperly considered. A psychiatric examination of defendant was asked for and granted by the court, and the Mental Health Institute at Clarinda discharged defendant on August 6, 1963, as "not psychotic".

However, an examination of the entire record would indicate defendant did have a competent and effective counsel in the legal sense of the words and, since we have no power to commute the sentence and no valid reason to set aside or reduce the sentence, we must permit the judgment to stand. State v. Kelley, supra, 253 Iowa 1314, 1325, 115 N.W.2d 184, and citations.

V. Having found no reversible error, the verdict and judgment must be and is affirmed.—Affirmed.

All JUSTICES concur except HAYS, J., not sitting.