STATE OF IOWA, appellee, v. LLOYD HUNTER, appellant.

No. 47943.

(Reported in 51 N.W. 2d 409)

FEBRUARY 5, 1952.

W. L. Fahey and W. G. Cimprich, both of Cedar Rapids, for appellant.

Robert L. Larson, Attorney General, Glenn L. Gray, Assistant Attorney General, and Willis Glassgow, County Attorney, for appellee.

MANTZ, J.—The defendant, Lloyd Hunter, was charged with first-degree murder. He pleaded not guilty and later entered a plea of guilty to the charge of second-degree murder. A hearing was had, evidence was taken and the court imposed a sentence of life imprisonment in the state penitentiary. The defendant has appealed alleging that the sentence imposed was excessive.

I. The sole question presented for our determination is defendant's claim that the trial court erred in imposing a life sentence upon the defendant for the reason that such sentence is harsh, unreasonable, excessive and unjust and was obviously intended by the trial court to deprive defendant of any benefits that he might receive for good behavior while serving such sentence.

The crime for which defendant was sentenced was committed September 9, 1950. An information charging defendant with first-degree murder was filed against him in the District Court of Linn County, Iowa, on September 11, 1950. It was charged therein that on the 9th day of September, 1950, Lloyd Hunter did willfully, deliberately and premeditatedly, with malice aforethought, kill William Hughes. It was approved by one of the judges of the district court and under it a warrant duly issued and defendant was held without bail. On the same date defendant, with his attorney, entered a plea of "not guilty." The

case was set for trial on November 27, 1950. Upon request of defendant's attorney the cause was continued until the January Term, 1951. On February 23, 1951, defendant in open court with his counsel, W. L. Fahey, withdrew his plea of not guilty by reason of insanity and offered to plead guilty to the offense of murder in the second degree. The State, by the county attorney, Willis Glassgow, stated it was willing to accept such plea. By agreement of counsel March 5, 1951, was fixed as the time for hearing to determine the degree of the offense and whether said plea should be accepted by the court.

The hearing was had. There was no dispute in the testimony as to the nature and particulars of the act of the defendant wherein he shot and killed William Hughes. The State offered various witnesses who testified in detail as to the killing. Briefly summarized: It appeared that on September 9, 1950, in Cedar Rapids, Iowa, defendant and his family were tenants in the front part of a house in that city belonging to William Hughes, a man eighty-four years of age, who then lived in the rear part of the house; that on that date Hughes and a neighbor from across the street were going to put up a mailbox on the front of said house; that while they were so engaged the defendant came out of the front door and called Hughes a vile name and gave him a kick; defendant then went back into the house and immediately came out armed with a 12-gauge shotgun which he aimed at Hughes; that he snapped the trigger, but the gun failed to go off; Hughes' companion warned defendant "go easy with that gun." Defendant went ahead and snapped the trigger a second time. The gun went off, blowing away a part of Hughes' face and killing him instantly. Defendant then went back into the house, put the gun aside and was there when the officers came. Defendant admitted the shooting and told several witnesses that he had had trouble with the dead man—that the latter stole from his garden; that they had trouble over a clothesline and that Hughes had made "passes" at his wife. He further said that he had talked to the authorities about his trouble with the deceased, but got no co-operation; that the day before the shooting he had talked with his employer and said he might have to shoot the deceased; he thought that he was entitled to justice, and if he did not get it he

was going to get it in his own way by shooting. At no time did defendant deny his act or offer any explanation save that "he had trouble with Hughes"; said he got his gun, loaded it, went to the door and fired the shot—"popped him." The muzzle of the gun when the fatal shot was fired was about four or five feet from Hughes.

At the hearing defendant offered two witnesses, both of whom had examined defendant with reference to his mental condition. Miss Alma Nicholas of Iowa City, employed as an assistant in the Psychopathic Hospital at the State University of Iowa, was one of such witnesses. She testified that she had made several tests of defendant to ascertain and determine his mental condition, and described the formula used. After such tests she rated defendant's intelligence quotient at 68. This, she stated, indicated a "borderline intelligence" and said that such rating was "not quite as low as a mental defective." It was her opinion that defendant's resistance to problems, due to his I. Q., would be "smaller than normal"; such tests might vary with the individual; also, that there could be present "a margin of error." The other witness was Dr. Miller, a director of the Psychopathic Hospital at the Iowa State University. His qualifications were not questioned. He had made several examinations of the defendant. He detailed methods used and defendant's reactions, his examination and cross-examination were quite lengthy and the court asked various questions touching the tests made and the conclusions reached. We set forth from the statement of the court a summary of the testimony of Dr. Miller:

"Also he advances in the way of mitigation the fact, through his witness, Dr. Miller, that at the time of this occurrence he was in what Dr. Miller called a psychotic episode, that is, he was reacting directly and primitively, as Dr. Miller said; at the time of the act, Dr. Miller said he knew what he was doing but that he did not then appreciate morally the difference between right and wrong, nor would anyone else appreciate that difference in an intense rage. Now the court has considered that, and has considered the further testimony of Dr. Miller, and all these other circumstances, and is accepting the fact that the defendant through a combination of circumstances was so goaded, and ag-

gravated, and frustrated to the point that he lost his head, and as the defendant himself says, he blew his top, and he acted in an intense rage."

The defendant did not take the witness stand to explain his acts and the reasons therefor to the court.

Following the hearing on March 10, 1951, and after all the evidence was taken, the court called defendant and his attorney to the bench and they announced that defendant was ready to receive the sentence of the court and the court inquired of the defendant if he had anything to say as to whether or not sentence should be pronounced at that time. Defendant answered in the negative.

The court then advised defendant that he had been charged with first-degree murder; that he had offered to plead guilty to murder in the second degree and advised defendant that after hearing the evidence the State accepted the plea of second-degree murder. Following this the court dictated into the record a statement of the reasons given for accepting the plea and for pronouncing sentence. This statement is a full, fair and complete summary of the record and declares that there is no claim by the defendant that he was insane when he shot Hughes. It reviews the testimony of all witnesses and calls attention to the fact that if there had been a trial on the charge of first-degree murder the evidence was sufficient to have warranted a jury to bring in a verdict of guilty of first-degree murder and they could have imposed the death penalty. It further calls attention to the fact that defendant failed to take the stand and explain his action to the court. Following this the court sentenced the defendant, Lloyd Hunter, to be confined in the state penitentiary at Fort Madison, Iowa, for life.

██ ██ The trial court in pronouncing sentence acted under section 690.3, Code of Iowa, 1950, which provides as follows:

"Whoever commits murder otherwise than as set forth in section 690.2 is guilty of murder in the second degree, and shall be punished by imprisonment in the penitentiary for life, or for a term of not less than ten years."

Under the above statute the trial court could properly exercise a discretion in pronouncing sentence. The sentence which the trial court imposed followed a hearing which had for its purpose the advising of the court of the nature and extent of the crime. The information under which defendant was charged was for first-degree murder. We think that all of the elements required to show such crime were fully and completely shown. The intentional use of a deadly weapon amply infers malice and an intent to kill. State v. Sullivan, 230 Iowa 817, 298 N.W. 884; State v. Mercer, 223 Iowa 1134, 274 N.W. 888; State v. Burris, 198 Iowa 1156, 198 N.W. 82 (and cases there cited).

The defendant had told of his intention to shoot the deceased and followed this by doing the very thing he had threatened to do. This would show premeditation and an intent to do the killing.

Defendant, in his brief, has cited many cases dealing with the question here involved. Other cases to the contrary have been cited in the brief of the State. We have gone over them and can see no need for setting them out and attempting to analyze them. Many of them hold that in proper instances this court in the exercise of its statutory right may reduce a sentence if it is so disproportionate as to the degree of guilt as shown by proof, but further hold that the record must show some legal grounds upon which to warrant such reduction.

We have gone over the record with care and fail to find any legal data which would warrant us to modify or change the judgment of the trial court. The crime for which defendant was sentenced was a heinous one, committed without a shred of justification or excuse. See State v. O'Dell, 240 Iowa 1157, 39 N.W.2d 100; State v. Olander, 193 Iowa 1379, 186 N.W. 53, 29 A. L. R. 306; State v. Albertson, 237 Iowa 1148, 24 N.W.2d 395; State v. Freeman, 27 Iowa 333; State v. Baughman, 20 Iowa 497, 501. In the last two cited cases it was urged upon appeal that the sentence imposed was excessive. Both opinions were by Justice Cole. In both it is stated that while the supreme court has authority to modify the penalty and reduce the punishment, yet, "in order to do so, it must have some legal data upon which to base its action."

These cases further hold that the imposition of a penalty is a matter for the trial court in the exercise of its discretion.

We are satisfied we should not interfere with the judgment of the trial court, and the case is affirmed.—Affirmed.

All JUSTICES concur except SMITH, J., not sitting.