STATE OF IOWA, appellee, v. LOUIS A. MYERS, appellant.

No. 48957.

(Reported in 79 N.W.2d 382)

NOVEMBER 13, 1956.

Stewart Winstein, of Rock Island, Illinois, and Seymore M. Raben, of Davenport, for appellant.

Dayton Countryman, Attorney General, Raphael R. R. Dvorak, Assistant Attorney General, Martin Lier, County Attorney, and Wayne C. Andresen and Edward N. Wehr, Assistant County Attorneys, for appellee.

LARSON, J.—Defendant, Louis A. Myers, was arrested in his apartment at the Scott Hotel in Bettendorf, Iowa, between 9:30 and 10 a. m. March 1, 1955, and on March 15 was indicted by the Grand Jury and charged with the crime of murder in the first degree. On March 26, upon defendant's request, the court appointed H. Moss Meersman of the Moline, Illinois, bar as his counsel, reserving the right to appoint additional counsel later. On April 2 defendant entered his formal plea of not guilty. Thereafter followed several motions on his behalf including a motion for change of venue which was argued April 29, 1955. At that hearing defendant was asked if he desired additional counsel, but he deferred answer until May 2. At that time he asked the appointment of Carl Lambach of the Scott County, Iowa, bar, but as Lambach was otherwise engaged the court appointed Seymore M. Raben of said bar as the additional counsel for defendant.

On June 6 Attorney Meersman alone filed a "Demand for Trial by Jury" and also a motion to remove all court-appointed counsel and requesting that his appearance be entered as defendant's personal and formally-retained counsel. At the hearing, Meersman being absent, Myers denied knowledge of the maneuver and the court continued the matter for consultation between counsel and defendant. However, on June 27 the motion was granted and Meersman became his sole attorney of record.

In view of these developments and the approaching trial, the county attorney moved for a continuance until the September 1955 term, which was granted. Thereafter, by agreement of counsel in August, the case was assigned for trial in September. On September 28, 1955, with defendant's consent in writing, Meersman withdrew his appearance and defendant then entered the appearance of Stewart Winstein, another Illinois attorney. The court then continued the case until October 17, 1955. On October 11 Winstein appeared and refused to represent defendant unless he be granted further time to prepare for trial. The trial court rejected this request, and on October 11 appointed Bertram Metcalf of the Scott County bar as defendant's counsel. Clay LeGrand, president of the Scott County, Iowa, bar, was appointed October 13 to assist in the defense. On October 14,

1955, they filed a motion for continuance with their attached affidavits setting forth the contention that they had inadequate time in which to prepare a defense for the defendant and were unfamiliar with the facts' or evidence pertaining thereto, and that unless a continuance was granted, defendant would be denied due process of law and could not obtain a fair trial. As intimated beforehand by the court, this continuance was denied October 17, 1955, and the trial commenced October 19, 1955. Defendant was convicted of second-degree murder and was sentenced to a term of thirty-eight years in the penitentiary.

In his appeal defendant assigns seven specifications of error which we will condense for discussion. His first contention relates to his right to effective and proper representation of counsel. We have already set out the facts pertaining to defendant's claim of inadequate representation. Other facts will appear in the opinion.

■■ I. It is true one of our most prized and cherished rights under the Federal and State Constitutions is the right to a fair trial. In order to give substance to this announced right we provide that one accused of a crime shall have benefit of counsel, and in most jurisdictions the court has said this means "effective counsel." See annotation 148 A.L.R. 183. While that term has not received a specific definition, a careful study of its application leads to the conclusion that it means honest, learned and able legal counsel given a reasonable opportunity to perform the task assigned to him by the court. Therefore, the circumstances govern to a large degree the reasonableness of the opportunity and considerable discretion must be lodged in the trial court who is in a position to observe the adequacy and diligence of counsel in presenting the defendant's case. Only when it clearly appears in the record that this discretion has been abused should we interfere. It is indeed a heavy burden that must be carried by a defendant who claims his counsel was ineffective and did not properly represent him before the court. State v. Benson, 247 Iowa 406, 72 N.W.2d 438.

Section 775.4, Code of Iowa, 1954, provides: "If the defendant appears for arraignment without counsel, he must, before proceeding therewith, be informed by the court of his right thereto, and be asked if he desires counsel; and if he does, and

is unable to employ any, the court must allow him to select or assign him counsel, not exceeding two, who shall have free access to him at all reasonable hours."

The defendant may select available counsel or may refuse counsel as he then desires. State v. Meeks, 245 Iowa 1231, 1240, 65 N.W.2d 76, and cases cited therein. Here we find Myers selecting an Illinois attorney who represented him throughout the preliminaries without complaint by him to the court. Now he contends Meersman was not qualified nor competent to represent him and that the court should not have appointed him as defendant's counsel. It is true he was not admitted to practice law in the State of Iowa, but we fail to find any provision of the law which requires appointment of an Iowa lawyer as counsel for one charged with a crime. There can be no such arbitrary rule. We cannot say all qualified practitioners of other states are per se unqualified counsel in Iowa any more than we can say all Iowa lawyers are qualified to effectively conduct the defense of one charged with a capital offense. It is rather a matter of proof which falls upon one contending that his counsel, appointed or retained, was actually unable, unskilled, or ineffective as his defense counsel. It may be conceded that the court must exercise a little more care in assigning counsel to see that he is qualified to effectively defend the one charged with a crime, but the defendant himself is not without obligation in selecting and retaining counsel of his choosing. Neither can he concur in and encourage a lack of care and diligence in the hope of later complaining as to his counsel's shortcomings. In any event it must be defendant's burden to show his counsel's inability to act and that such ineffectiveness did prevent him from receiving a fair trial. Such contentions have been heretofore considered by us and rejected. State v. Benson, supra; State v. Smith, 199 Iowa 568, 202 N.W. 112; State v. Dangelo, 182 Iowa 1253, 166 N.W. 587.

We conclude defendant, Myers, has failed here to show he was free from responsibility for any fault in the selection of counsel or that due to any incompetency, unpreparedness or decision of his counsel, he did not receive a fair trial. On the other hand, from the record we find the trial court exercised care to protect the defendant's interest at all times, even to the point of

questioning him as to his concurrence with the procedure taken by his Illinois attorney on motions before the court. This and other action clearly disclose the trial court's concern for the defendant's rights and a desire to see that he was effectively represented at all times. Myers knew as early as September 11, 1955, that Meersman would not try his case and, although he suspected Meersman's inability to do so, did not discharge him or advise the court of this knowledge until there was a serious question as to whether it was too late to obtain other counsel to represent him effectively at the assigned trial. This action to force a continuance by changing counsel is evident and it becomes now his grounds of ,complaint because his new counsel were not given adequate time to prepare. It is true counsel who tried the case were faced with a hard task, but it appears they were able to apply themselves without interruption for the 7½ and 5½ days respectively toward the preparation for trial. We observe in that respect that the defense was ably, vigorously and conscientiously conducted. Few others could have done better with any period of preparation. Consequently we agree with the trial court and find no merit in this assignment.

II. As to the specification of error due to the denial of a continuance, the rule is well settled. The granting or refusal of a motion for a continuance rests largely in the sound discretion of the trial court. State v. Meeks, supra; State v. Mauch, 236 Iowa 217, 224, 17 N.W.2d 536; State v. Sterman, 199 Iowa 569, 572, 202 N.W. 222; State v. Pell, 140 Iowa 655, 663, 119 N.W. 154, 157. The rule laid down in the Pell case is not disputed. There we said:

"The whole matter of granting a continuance rests largely in the discretion of the trial court, and it should only be granted for a cause which satisfies the court that substantial justice will be more nearly obtained. * * * This court will not interfere with the action of the trial court in this respect, unless it clearly appears that such discretion has been abused and an injustice has been done [citing cases]."

Seldom have we seen more care exercised by a trial court in an effort to see substantial justice obtained. While the time to prepare given defense Attorneys Metcalf and LeGrand was short, the court provided that all exhibits, files and records of the

county attorney's office be made available to these counsel, and this was done. In addition, when deciding that the trial should proceed, the court advised the defendant's counsel: "If there is a decision adverse to the defendant and I find in my eyes, due to lack of preparation some attorney has not given him a proper defense, I can always grant a motion for a new trial." When given that opportunity later by such a motion, we think the trial court's ruling in denying it was correct. It then appeared counsel were not greatly hindered or embarrassed by a lack of ample preparation. It is true there were over thirty witnesses testifying for the State and many exhibits, but, in the trial proper, defense counsel disclosed clear knowledge and understanding of their import and ably handled the defense as to the involved issues.

Defendant relies principally upon State v. French, 240 Iowa 1, 35 N.W.2d 1, but there defendant was indicted December 8, trial set December 17, and counsel appointed December 15. This court, under the circumstance requiring investigation of various financial transactions in other states, decided proper preparation could not be and was not made as was necessary to the defense. There we held justice was defeated and a new trial granted. Such is not the case before us where eight months had passed and the issues were not complicated. The circumstances of the two cases are far different. Each case must depend upon its own facts and circumstances on this issue. State v. Mauch, State v. Sterman and State v. Pell, all supra.

We conclude no abuse of the trial court's discretion in overruling the motion for continuance appears and that the court was correct in rejecting the motion for a new trial upon that ground.

III. Defendant's assignment of error pertaining to an improper opening statement to the jury is without merit. The rule is well stated in State v. Thompson, 241 Iowa 16, 29, 39 N.W.2d 637, 644, where we said: " * * * in every case that is tried, there are usually found statements by counsel as to what they expect to prove but later find that they are unable to do so. * * * we are not prepared to say that such statements show deliberate bad faith on the part of counsel, such as to constitute reversible error." Here the county attorney said in substance

the State intended to prove by two witnesses that defendant and decedent had some arguments, and harsh words were spoken between them the evening of February 28 over money matters, and that the jury would be convinced defendant in a fit of rage shot and killed Delores Lund. No one testified as to these quarrels, though it was apparent one or two witnesses surprised the State's counsel when they did not admit they knew the defendant. There is some evidence of defendant's disposition, however, for his own girl friend, Elizabeth Teahan, testified he had slapped her on at least one occasion. We are not prepared to say as a matter of law that by such statements the State acted in bad faith with intent to mislead the jury. Its plan to prove motive failed. As there was no evidence of premeditation or deliberation, the trial court took the issue of first-degree murder from the jury, and the motive then became unessential to the decision. State v. Klute, 160 Iowa 170, 179, 140 N.W. 864. The court's instruction upon that matter was ample and there is no merit in defendant's contention that his proposed instruction was necessary to counteract the county attorney's opening statement. Also see State v. Alberts, 241 Iowa 1000, 43 N.W.2d 703.

IV. We come now to defendant's other principal assignment relating to the competency and admissibility of certain demonstrative evidence and exhibits. While it is true an object cognizable by the senses is admissible only when it is shown to have such relation to the fact in dispute as to afford reasonable grounds of belief respecting it (State v. Concord, 172 Iowa 467, 154 N.W. 763), a wide latitude is generally allowed in admitting circumstantial evidence where direct evidence is lacking to establish one's theory. Although the trial court usually has considerable discretion in ruling on circumstantial evidence, it must be such as to lead to a reasonable inference and not a mere suspicion of the existence of the facts sought to be proven. State v. Sedig, 235 Iowa 609, 16 N.W.2d 247; State v. Christie, 243 Iowa 1199, 53 N.W.2d 887, 54 N.W.2d 927; State v. Stuart, 241 Iowa 1004, 43 N.W.2d 702; State v. Marcus, 240 Iowa 116, 34 N.W.2d 179; 22 C.J.S., Criminal Law, section 604, page 928; 20 Am. Jur., section 273, page 261; 26 Am. Jur., section 312, page 366. The testimony was that of State witnesses, except for three offered by the defense. The latter testified only as to the

layout of the premises involved and as to the noises in and about the hotel on the evening in question, as a denial of the testimony of the State's witness Winkler. Winkler, whose room was near defendant's, said he thought he heard a shot about the time Delores Lund was supposed to have been fatally wounded. The defendant gave no testimony.

The record discloses that defendant and deceased were seen drinking in the Subway Tap in the Scott Hotel about 12:10 p.m. February 28, were seen later at the Arrowhead Tavern, and about 5:45 they appeared at Mac's Tavern where he had two drinks and she three drinks before their meal. They left about 6:45 p.m. and went to defendant's apartment in the Scott Hotel where they were discovered about 7 p.m. in bed under a sheet by Miss Teahan, a nineteen-year-old pregnant girl by defendant, who had been living there on occasions with defendant and who had a key to the apartment. Miss Teahan was upset, but went back to the Subway Tap. Later she returned to the apartment and, finding the door barred, this time demanded her clothes. Defendant told her to go away and she returned crying to the Subway Tap. About a half hour later defendant came into the Subway Tap and sat down with Miss Teahan. About 10 p.m. they drove to Davenport, picked up Sherman Stewart, came back to the Subway Tap and remained there until midnight. Sometime after they returned, defendant left the other two for about twenty minutes, going out the west inside door leading to the bathrooms, the upstairs, and to the paint and furnace room. After his return from the same door, the three went to Rock Island, Illinois, where they purchased drinks in three different taverns. About 2:30 a.m. they came back to Davenport, ate at the Steak House, took Stewart home, and defendant and Miss Teahan spent the remaining portion of the night at defendant's apartment where they were later taken into custody by the police. In the meantime, about 8 a.m. March 1, the nude body and personal effects of Delores Lund were found beside a roadway a short distance east of Bettendorf, Iowa. Death occurred as a result of a bullet wound in her chest. The bullet was removed and became an exhibit in this case.

The door of Myers' room was directly across from a door leading to the rear outside entrance to the hotel. From that door

it was six steps down a flight of stairs to the parking lot where defendant had a car parked during the early evening. An officer testified it took him less than ten minutes to make a round trip from that parking lot to the place where the Lund woman's body was found.

Sometime after Stewart joined the couple after 10 p.m., although then intoxicated, he recalled he asked defendant where Delores Lund was. He testified: "When I asked where she was, he says, 'She isn't here.' I said, 'Why?' He said, 'I killed her and I didn't mean to.' "

We also discover by the record that defendant had secured clean linen for his room about noon February 28 and then called for another set of clean linen about 9 p.m. on the same day. On the last request he was given a key to the linen room, which was usually kept locked, and went after the supplies himself. He did not turn in soiled linen to the desk at that time. A large bag was kept in the linen room where the soiled linen was usually placed. When Miss Teahan and defendant arrived at his room later to spend the night, she found fresh folded linen on the bed and proceeded to make it before they retired.

Soiled linen from the hotel is sent to the laundry once a week. On March 5, as the hotel manager was going through the soiled linen bag and preparing to send the laundry out, two bloodstained sheets were discovered and turned over to the police. Prior searches by police on March 1 and 2 had failed to turn up anything but a Cannon towel bloodstained, an army blanket with a hole in it which could have been a bullet hole, and a bed sheet with two very small stains upon it. There were thirty-one guests in the hotel and the manager of course did not know where the various soiled linen came from.

On March 6 a bloodstained bed pad was discovered in the linen room by a deputy sheriff, and on the following day in the hotel basement paint room the gun, which later proved to be the weapon used to kill Delores Lund, was discovered wrapped in a pair of gray flannel trousers. These trousers, which were bloodstained on the right side, matched a coat turned over to the police by defendant, Myers, at the county jail.

The objects mentioned were introduced into evidence and became the following exhibits: Bed pad, No. 11; sheets dis-

covered by hotel manager, No. 14 and No. 15; and the Cannon towel, No. 4. All were found by F. B. I. agents to have been stained with human blood of International Blood Group A, as were the bloodstains on the trousers that were wrapped around the gun. The third sheet proved to be of Type A-B blood and it was not introduced. The trousers became Exhibit No. 12 and the gun Exhibit No. 13.

While no one testified having seen defendant in possession of the gun, it was positively identified as a gun belonging to Mr. Augie De Paepe, who last saw it in his safe on or about February 2, 1955. His safe was burglarized that night and the gun was missing along with considerable money. Defendant had told the bartender Gerald Murphy at Augie's Tap that his place was going to be "knocked off." Murphy did not lock the safe that night. Defendant was seen in the alley next to the tavern on this night but was not seen burglarizing the place. However, in Davenport the next day he told Murphy "he was sorry to hear of all the trouble" he was in and gave him $400.

Contending any defendant connection therewith was only conjecture, objection was made to all of the demonstrative evidence. It is defendant's contention these exhibits were also inadmissible because they were too vague, indefinite and remote, because they were not connected with defendant, and because they were found under circumstances which would connect them with many other persons and not with any crime or criminal act. While there may have been other persons who could have had connections with these exhibits, when the whole pattern is placed together, the finger of guilt points strongly to the defendant and no one else, and we believe the exhibits and testimony were properly received as circumstantial evidence in this case. While forty per cent of the white population have Type A blood, and some thirty-one persons lived on these premises, and while decedent's blood type was not shown, the bloodstained trousers wrapped around the weapon used to kill Delores Lund sufficiently identified her blood type so that the jury could find the blood on the sheets, pad, towel, and trousers were all from her fatal wound. Considerable discretion is vested in the trial court in determining the admissibility of such evidence, and we find herein no abuse of that judicial discretion. State v. Christie,

supra, 243 Iowa 1199, 1210, 53 N.W.2d 887, 54 N.W.2d 927, 929, and cases cited therein.

There was other evidence as to the similarity of dirt found on Miss Lund's body and the hotel parking lot, but we would unduly extend the record to review it all.

We conclude the facts related led to a reasonable inference, and not a mere suspicion, that defendant had the gun, shot the Lund woman, disposed of the body, and hid the articles connected therewith upon the hotel premises. State v. Christie, supra; State v. Stansberry, 182 Iowa 908, 912, 166 N.W. 359; State v. Jones, 233 Iowa 843, 10 N.W.2d 526. A fact question for jury determination was resolved and there was no error in considering such evidence.

V. The trial court withdrew jury consideration of first-degree murder, but defendant now contends it was in error by not also withdrawing the issue of second-degree murder as well. The contention is made that there was no evidence tending to prove malice aforethought. Proof of intentional homicide, without the circumstances of mitigation or excuse, affords a presumption of malice, and therefore murder. The use of a deadly and dangerous weapon in a dangerous manner raises a presumption of malice, and therefore murder in the second degree. State v. Christie, supra; State v. Leib, 198 Iowa 1315, 201 N.W. 29; State v. Phillips, 118 Iowa 660, 92 N.W. 876. The intent to kill may also be inferred from the use of a deadly weapon in a deadly and dangerous manner, but it is also true there can be no further inference of deliberation and premeditation and by its use justify the submission of the issue of first-degree murder. State v. Leib, supra. Clearly then as to the degree of murder, much depends upon the evidence surrounding the killing, and this one is no exception. Under the circumstances related in this case, we believe the trial court was correct in submitting to the jury the issue of second-degree murder. For further discussion of this question, see State v. Fischer, 245 Iowa 170, 60 N.W.2d 105; State v. Haffa, 246 Iowa 1275, 1291, 71 N.W.2d 35, and cases cited therein; State v. Hofer, 238 Iowa 820, 28 N.W.2d 475; State v. Hunter, 243 Iowa 361, 51 N.W.2d 409; State v. Bruntlett, 240 Iowa 338, 36 N.W.2d 450.

There were no circumstances of mitigation or excuse offered. There was no proof, direct or circumstantial, if the jury believed that defendant attacked the deceased with a deadly weapon, that it was with just cause, legal excuse, or of provocation, and the presumption of malice was therefore proper. See 26 Am. Jur., pages 182–184; State v. Powell, 237 Iowa 1227, 24 N.W.2d 769.

It has also been said in this connection that malice is not limited in its meaning to hatred, ill will or malevolence, but rather pertains to a wicked and corrupt disregard for the lives and safety of others. While there is testimony defendant said he killed her and "didn't mean to", the cold calculating act of then denying her aid, as she bled to death and of later disposing of her nude body along a roadside, could not be called evidence which would overcome the presumption of malice in the use of the deadly weapon. We conclude there was no merit in this assignment of error.

VI. Complaint, though not serious, is made as to the sufficiency of several of the trial court's instructions, but we have carefully reviewed each of them and find they were substantially complete and correct as given. It would unduly lengthen this opinion to discuss each of them. They were not erroneous.

VII. We also conclude the trial court committed no error in refusing to direct a verdict of acquittal as requested by defendant. It is, of course, the law that in passing upon the sufficiency of the evidence to sustain a verdict, the State's evidence must be taken as true and must be viewed in the light most favorable to the State. State v. Williams, 245 Iowa 401, 62 N.W.2d 241, and cases cited therein; State v. Johnson, 243 Iowa 1319, 55 N.W.2d 196; State v. Rutledge, 243 Iowa 179, 47 N.W.2d 251, 50 N.W.2d 801. We are satisfied herein that there was competent evidence introduced and reasonable inferences established sufficient to support the jury verdict, and that the court's instructions were correct and proper. There being no reversible error, the judgment must be affirmed.—Affirmed.

All JUSTICES concur.