# IN THE COURT OF APPEALS OF IOWA

No. 21-1803
Filed January 25, 2023

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**STEPHEN DELOI LUCORE,**
    Defendant-Appellant.

_____

Appeal from the Iowa District Court for Johnson County, Jason D. Besler, Judge.

Stephen LuCore appeals various criminal convictions and sentences following a bench trial. **AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**

Martha J. Lucey, State Appellate Defender, and Melinda J. Nye, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Kyle Hanson, Assistant Attorney General, for appellee.

Considered by Greer, P.J., Badding, J., and Mullins, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2023).

**MULLINS, Senior Judge.**

Following a bench trial, Stephen LuCore was convicted of homicide by vehicle, serious injury by vehicle, second-degree murder, willful injury causing serious injury, and three counts of willful injury causing bodily injury—all stemming from a motor vehicle collision precipitated by LuCore driving in the wrong direction on an interstate in an attempt at suicide. For purposes of sentencing, the district court stated it would merge two of the convictions with two others. Yet the court entered judgment and imposed sentence on all counts.

LuCore raises various arguments on appeal. First, as to his four willful injury convictions, LuCore argues the evidence was insufficient to establish he acted with the specific intent to cause serious injury to the passengers in the other vehicle. Second, for his murder conviction, he argues the evidence was insufficient to establish he acted with malice aforethought. Third, LuCore argues the verdicts are inconsistent because his convictions of homicide and serious injury by vehicle, which involve recklessness and unintentional harm, are incompatible with his convictions of willful injury and murder, which involve specific intent and malice aforethought. Fourth, LuCore argues the district court erred in failing to actually merge his convictions and sentences.

I.      **Background Facts and Proceedings**

On June 16, 2019, a family was traveling through Iowa by motor vehicle, returning to Texas from a family reunion in Wisconsin. David was driving; his father, Robert, was in the front passenger seat; and David's two young children, D.S. and L.S., as well as his mother-in-law, Luz, were in the back seat. As the family was traveling in the dark on westbound Interstate 80 through Johnson

County at roughly 9:30 p.m., "a black sedan car with the headlights off"—being driven by LuCore—approached, traveling eastbound in the westbound thoroughfare. Robert noticed it first and "shouted right away watch out." David swerved the vehicle to his left, and LuCore swerved to his right, resulting in a head-on collision between the vehicles at a combined speed of 151 miles per hour. The culminating wreckage was catastrophic. Several law enforcement officers testified they had never seen anything like it. The collision was so forceful that the black sedan's engine block left the vehicle and settled in the roadway. Before trial, the parties stipulated Robert died as a result of the injuries he sustained in the collision, Luz sustained serious injuries, and David and his two children sustained bodily injuries.

Trooper Matthew Schwenn is certified as a technical accident investigator, collision reconstructionist, and crash data retrieval technician. His investigation of the collision included collecting data from both of the vehicles involved. Information from the data recorder system of LuCore's vehicle showed that, five seconds prior to the collision, he was traveling at a rate of sixty-five miles per hour with an acceleration throttle of thirty percent. One-half of a second later, the throttle percentage increased to ninety-six percent, which means the accelerator was "nearly floored" or "floored." It stayed in that position up until the collision, and the vehicle's speed increased to eighty miles per hour, without the service brake ever being applied. The data from the vehicles is consistent with a conclusion that LuCore corrected his course of travel to ensure he collided with the family vehicle after David swerved to avoid contact.

The evidence is undisputed that LuCore drove against traffic in an attempted suicide. When Deputy Kyle Campbell of the Johnson County Sheriff's Office arrived on the scene, he observed LuCore "on the side of the road sobbing on the ground." Deputy Matthew Hendricks also observed LuCore crying. Deputy Hendricks questioned LuCore whether he was trying to kill himself because, in his experience with wrong-way drivers, two reasons "that jump to mind right away would be impairment or suicide attempt," and LuCore's "emotional state led [him] to believe that it was probably a suicide attempt." LuCore responded that he was trying to kill himself. During his ensuing interactions with LuCore, Deputy Jesse Lenz observed LuCore to be distraught, "very emotional," and crying intermittently.[1] Trooper Adam Wiltfang of the Iowa State Patrol went to the hospital to speak with LuCore about an hour after the collision. Wiltfang described LuCore to be in a state of shock.

Dr. Luis Rosell, a psychologist, testified as an expert on behalf of the defense at trial. His evaluation of LuCore and the other evidence presented discloses the following. LuCore has a history of depression, substance abuse, suicidal ideation, and prior attempts at suicide. He began using methylone—"an empathogen and stimulant psychoactive drug"—some time ago. He maintained sobriety for a period of about five years but, in 2016, he relapsed and thereafter continued using similar substances through the time of the collision. LuCore's substance abuse resulted in his dismissal from his graduate studies, had negative effects on his personal relationships, and led to legal troubles. He was previously

---

[1] Deputy Lenz's interaction with LuCore was captured by his body camera, and the video was admitted as evidence at trial.

hospitalized several times due to his suicidal ideations and attempts at suicide.

His attempts at suicide involved trying to jump off buildings and poison himself with

carbon monoxide. He then "found a list of the most effective suicide modes. These

included guns, jumping, hanging, and motor vehicle accidents." Based on his

previous failures and his lack of access to a firearm, LuCore formulated a plan to

die by motor vehicle collision. LuCore reported the following to Dr. Rosell:

> I had the plan in my head I would be on top of an off-ramp and then see far enough to see two semis and then drive down the off-ramp towards them. . . .
>
> On the day of the crash, I decided I was going to kill myself. I went looking for the place on the off-ramp so I could go down towards the semis. I was trying to engineer a crash to kill myself. That night I waited until it was dark and went towards I-80 west and started driving. At this point, I had tried suicide a bunch of times, and I still did not know if it was going to work. I was not sure if I would actually do something that day. . . . I was driving and driving and had not made up my mind. I was west of 380 and was thinking what am I going to do. . . . Then I looked in my rearview mirror and there were two sets of headlights and then they disappeared behind the hill. At that moment, I thought I could just turn around and drive towards them. I slowed down and as I came to a stop, which was the decision moment and I have thought about this a lot over the past two years. I thought I could pull off and go home, or this is the chance to turn around and speed up to the semis. But I always had the hesitation and the last step off the ledge, and even when I lit the charcoal, I knew that I would jump up and stop. The last step always kept me from following through. That question posed itself in my mind. My answer was yes, and I did it. I spun the wheel around and hit the gas, and a few seconds later, the crash happened. I turned my lights off and had taken off my seat belt . . . first. . . . I remember veering into their direction to maintain the head on. . . . I call it the crash as it was not an accident. I feel terrible about it, I never intended for anyone to be hurt but me. I never considered anyone else involved. I know it is hard to believe that. The calculation ended when I thought I would be dead. I was not considering what would happen to others. . . . It did not happen the way I had planned it. My only intention was to kill myself and not anyone else. I agree that I acted recklessly and stupidly to obtain release from my problems. I should have known that I was putting others at risk. But that was not something I was thinking about. I was depressed, thoughtless, and did not consider the impact on others. I did not do this for the purpose

of hurting anyone but myself. My intent was suicide by car. . . . I didn't treat the vehicles as if there were not any drivers. I knew there were people in the cars, when I was out on the road and was driving and had the idea already in my mind. I was just focused on my own anguish and pain and was trying to escape, and sadly did not think of others at the time.

For his assessment, Dr. Rosell reached the following overall conclusion:

Mr. LuCore understands how it appears he must have known his plan would have possibly killed someone, and therefore it was based on malicious thought. Although he admits his conduct was wrongful and unlawful, he denies the crash was not grounded in hatred or evil. Mr. LuCore was focused on his dependency and depression. He was searching for a way to end the pain he was experiencing. In every facet of his life, there was despair; relationships, occupation, school, housing, finances, and through this, his addiction remained. His ability to problem-solve effectively and consider aspects and consequences of every situation clearly was severely compromised. His depression and chronic substance use affected his mental status and failure to consider his actions' overall consequences. Although the crash was premeditated and deliberate, the only person he intended to kill was himself.

In his testimony, Dr. Rosell opined LuCore "suffered from diminished capacity, a mental condition which does not allow the person to formulate premeditation, deliberation, specific intent to kill" or cause harm. Yet, on cross-examination, Dr. Rosell agreed LuCore was able to form the specific intent to kill himself and appreciated the facts that a head-on collision on the interstate would be fatal and any vehicle he came into contact with would be occupied.

Ultimately, LuCore was charged by trial information, as amended, with homicide by vehicle, serious injury by vehicle, first-degree murder, willful injury causing serious injury, and three counts of willful injury causing bodily injury. After

LuCore was determined to be competent to stand trial,[2] he filed a notice of his intention to rely on the defense of diminished responsibility.

Trial was ultimately held in January 2021. Following trial and the submission of written closing arguments, the court entered its verdict. The court found LuCore guilty of (1) homicide by vehicle relating to Robert, (2) serious injury by vehicle relating to Luz, (3) second-degree murder relating to Robert,[3] (4) willful injury causing serious injury relating to Luz, (5) willful injury causing bodily injury relating to David, (6) willful injury causing bodily injury relating to D.S., and (7) willful injury causing bodily injury relating to L.S. The court found LuCore possessed specific intent to cause serious injury but he did not have specific intent to kill anyone other than himself. As to the murder charge, the court also found LuCore acted with malice aforethought.

At the time of sentencing, the parties and court agreed count one would merge with count three and count two would merge with count four, thus leaving only counts three through seven. Yet the court adjudicated LuCore guilty and imposed sentences on each count. Later, however, the court expressly found that count one would merge with count three and count two would merge with count four. In its written sentencing order, the court likewise adjudicated LuCore guilty of and imposed sentence on all counts, although it noted merger would apply "for purposes of sentencing." Different from the oral pronouncement of judgment and

---

[2] At trial, the district court took judicial notice of the written psychiatric evaluation that was conducted pursuant to determining LuCore's competency.

[3] Second-degree murder was a lesser-included offense of first-degree murder as charged by the State.

sentence, however, the written sentencing order stated count four would merge with count two.

LuCore appeals.

**II.    Standards of Review**

We review a challenge to the sufficiency of evidence for errors at law, giving deference to the verdict, which binds us if it is supported by substantial evidence. *State v. Cahill*, 972 N.W.2d 19, 27 (Iowa 2022). While the presence of inconsistent verdicts is a question of law, we review that issue de novo. *State v. Montgomery*, 966 N.W.2d 641, 649 (Iowa 2021). This is because the issue "can be approached only with due regard to important constitutional concepts." *State v. Halstead*, 791 N.W.2d 805, 808 (Iowa 2010). "We review challenges to the legality of a district court's merger decision for correction of errors at law." *State v. Bullock*, 638 N.W.2d 728, 731 (Iowa 2002). To the extent a merger issue "presents a constitutional double jeopardy claim, our review is de novo." *State v. Finnel*, 515 N.W.2d 41, 43 (Iowa 1994).

**III.   Analysis**

A.      Sufficiency of Evidence[4]

In reviewing a challenge to the sufficiency of the evidence, the court views "the evidence 'in the light most favorable to the State, including all reasonable

---

[4] While LuCore moved for judgment of acquittal, we note defendants can now challenge the sufficiency of the evidence on direct appeal without first raising the specific challenge in a motion for judgment of acquittal in the district court. *See State v. Crawford*, 972 N.W.2d 189, 194 (Iowa 2022). Furthermore, error preservation is not a barrier to challenging the sufficiency of the evidence on appeal following a bench trial. *See State v. Howse*, 875 N.W.2d 684, 688 (Iowa 2016).

inferences that may be fairly drawn from the evidence.'" *State v. Ortiz*, 905 N.W.2d 174, 180 (Iowa 2017) (quoting *State v. Huser*, 894 N.W.2d 472, 490 (Iowa 2017)). All evidence is considered, not just that of an inculpatory nature. *See Huser*, 894 N.W.2d at 490. A verdict will be upheld "if substantial evidence supports it." *State v. Wickes*, 910 N.W.2d 554, 563 (Iowa 2018) (quoting *State v. Ramirez*, 895 N.W.2d 884, 890 (Iowa 2017)). "Evidence is substantial if, 'when viewed in the light most favorable to the State, it can convince a rational [factfinder] that the defendant is guilty beyond a reasonable doubt.'" *Id.* (quoting *Ramirez*, 895 N.W.2d at 890). Evidence is not rendered insubstantial merely because it might support a different conclusion; the only question is whether the evidence supports the finding actually made. *See State v. Jones*, 967 N.W.2d 336, 339 (Iowa 2021).

### 1. Willful Injury—Specific Intent

LuCore was found guilty of four counts of willful injury, each of which required proof beyond a reasonable doubt that he "intended to cause serious injury to another." Iowa Code § 708.4 (2019). LuCore argues "[t]he evidence was insufficient to establish that [he] was capable of forming, and did form, the specific intent to cause serious injury to anyone in the [family] vehicle."

The supreme court has stated the intent requirement of the willful-injury statute requires that "the defendant intended to cause serious injury to the victim (specific intent), not just do the act that resulted in serious injury (general intent)." *State v. Hickman*, 623 N.W.2d 847, 852 (Iowa 2001). As such, willful injury is a specific intent crime. *See State v. Smith*, 739 N.W.2d 289, 292 (Iowa 2007). Specific "intent is seldom capable of direct proof, but may be shown by reasonable

inferences drawn from facts established." *See State v. Chatterson*, 259 N.W.2d 766, 769–70 (Iowa 1977). And "defendants will ordinarily be viewed as intending the natural and probable consequences that ordinarily follow from their voluntary acts." *State v. Bedard*, 668 N.W.2d 598, 601 (Iowa 2003); *accord State v. Taylor*, 689 N.W.2d 116, 132 (Iowa 2004) (noting the natural-and-probable-consequences inference applies "regardless of whether [the crime] is a specific intent or general intent crime," and "[t]he State is assisted in meeting its burden of proof by" said inference); *State v. True*, 190 N.W.2d 405, 407 (Iowa 1971) ("It is a general rule, applicable to all criminal cases, including those where a specific intent is an element of the crime, that [the] accused, if sane, is presumed to intend the necessary or the natural and probable consequences of his unlawful voluntary acts, knowingly performed. Accordingly, the law assumes a person to intend all the consequences which one standing in like circumstances and possessing like knowledge should reasonably expect to result from any act which is knowingly done." (citation omitted)).

LuCore homes in on Dr. Rosell's testimony that he only had the capacity to form specific intent to harm himself. Yet, Dr. Rosell specifically agreed in his testimony that LuCore appreciated the facts that a head-on collision on the interstate would be fatal and any vehicle he came into contact with would be occupied. And while LuCore, in the account he gave to Dr. Rosell, clearly displayed he was only thinking about himself and his problems, he advised he specifically "engineered" this collision to be fatal, and he knew there were people in the cars he was targeting. While LuCore's goal was to kill himself, the law assumes he intended the natural and probable consequences of his voluntary act,

which would include serious injury or even fatality of an occupant of the vehicle he was targeting. LuCore tactically orchestrated a symphony of destruction, the natural and probable consequences of which were that others would be involved and would suffer adverse consequences.

So, viewing the evidence in the light most favorable to the State and verdict—as we must—we find substantial evidence supports the intent element of LuCore's willful injury convictions.

### 2. Murder—Malice Aforethought

Turning to his conviction for second-degree murder, LuCore argues "[t]he evidence was insufficient to establish that [he] acted with malice aforethought." While he agrees his actions were reckless, LuCore submits "[s]uicide is not illegal in Iowa" and, "[t]hus, [his] actions done with the intent to kill himself w[ere] not done with an 'unlawful purpose.'" He also points out he did not know any of the victims "and there was no evidence he harbored actual hatred for anyone in the car."

"A person who kills another person with malice aforethought either express or implied commits murder."[5] Iowa Code § 707.1. The establishment of malice aforethought does not require proof of specific intent to kill[6] or motive, and it may be inferred from the acts and conduct of the defendant on either an express or implied basis. *State v. Smith*, 242 N.W.2d 320, 326 (Iowa 1976). This elemental ingredient of murder contemplates a "condition of mind which prompts one to do a

---

[5] Any murder not meeting one of the criteria in Iowa Code section 707.2(1) is murder in the second degree. *See* Iowa Code § 707.3(1).

[6] Because second-degree murder is not a specific intent crime, LuCore's diminished responsibility defense does not apply to the charge. *See State v. Artzer*, 609 N.W.2d 526, 531 (Iowa 2000).

wrongful act intentionally, without legal justification or excuse. It does not mean mere spite, hatred, or ill will, but does signify a disposition which shows a heart regardless of human life." *State v. McCollom*, 151 N.W.2d 519, 525 (Iowa 1967). Malice involves "a wicked and corrupt disregard for the lives and safety of others." *State v. Myers*, 79 N.W.2d 382, 390 (Iowa 1956). An "inference of malice arises simply 'from the intentional use of a deadly weapon in a deadly manner,'" regardless of whether there was an opportunity to deliberate. *State v. Reeves*, 636 N.W.2d 22, 25 (Iowa 2001) (citation omitted). And an automobile can be considered a deadly weapon under certain circumstances, such as the circumstances in this case. *See State v. Frazer*, 267 N.W.2d 34, 39 (Iowa 1978). All in all, "[i]f unjustified and unexcused, causing physical harm or death is a wrongful act, and therefore the intent to do these things is a state of mind that would constitute malice aforethought." *State v. Green*, 896 N.W.2d 770, 780 (Iowa 2017).

While we acknowledge LuCore's primary goal was to kill himself, we reiterate that LuCore appreciated the facts that a head-on collision on the interstate would be fatal and any vehicle he came into contact with would be occupied. Regardless of whether his intentional acts were wrongful as to himself from a suicide standpoint, they were certainly wrongful as to the occupants of the vehicle he targeted on the interstate, without legal justification or excuse, and those acts, while accompanied by LuCore's self-centeredness, "signify a disposition which shows a heart regardless of human life," which is sufficient to establish malice aforethought. *McCollom*, 151 N.W.2d at 525. And LuCore used his vehicle as a fatal instrumentality, which at the very least creates an inference of malice

aforethought. As another state's high court explained: "That the primary purpose of the defendant's action was to take his own life does not preclude a finding of malice where he chose a method resulting in the taking of the life of another and failing to take his own." *Anderson v. State*, 330 S.E.2d 592, 594 (Ga. 1985) (affirming murder conviction as supported by malice aforethought where defendant argued that, "in driving head-on into the victim's automobile" the defendant "intended to take his own life, but did not intend to take the life of another").

Viewing the evidence in the light most favorable to the State and verdict, we find the evidence sufficient to support the malice aforethought element of murder in the second degree.

B. Merger

We next address LuCore's claims relating to merger. He argues the "district court erred in failing to merge the convictions for second degree murder and homicide by vehicle." While the court agreed the convictions merged, LuCore complains the court entered judgment and sentence on both counts. He raises essentially the same claims, although from a constitutional standpoint, as to his convictions of willful injury causing serious injury and serious injury by vehicle.[7]

The State concedes error, and we agree merger was appropriate, the homicide convictions under the one-homicide rule, and the serious injury

---

[7] Apparently relying on the district court's written sentencing order, LuCore submits count four—willful injury causing serious injury, a class "C" felony—should merge into count two—serious injury by vehicle, a class "D" felony. But, at the sentencing hearing, the parties and court agreed it should be the other way around, with the lesser offense merging into the greater offense, which is consistent with merger and double jeopardy principles. *See State v. Ceretti*, 871 N.W.2d 88, 96 (Iowa 2015).

14

convictions under double jeopardy multiple punishment principles. *See Ceretti*, 871 N.W.2d at 96 (explaining the one-homicide rule "prohibits 'a trial court from entering judgments and imposing sentences for multiple homicide offenses if the defendant was convicted for killing only one person'" (citation omitted)); *State v. McKettrick*, 480 N.W.2d 52, 58 (Iowa 1992) (finding defendant could not be convicted of separate offenses and receive multiple punishments for a single assaultive act); *see also* Iowa Code §§ 707.6A(4) (criminalizing causing *a serious injury* by vehicle), 708.4(1) (criminalizing willful injury causing *a serious injury*). But the parties part ways on the question of remedy, with LuCore requesting resentencing and the State requesting correction of the written judgment and sentence by nunc pro tunc order to make it consistent with the court's oral pronouncement of sentence. *See State v. Hess*, 533 N.W.2d 525, 528 (Iowa 1995) (stating "where there is a discrepancy between the oral pronouncement of sentence and the written judgment and commitment, the oral pronouncement of sentence controls" and "when the record unambiguously reflects that a clerical error has occurred, we will direct the district court to enter a nunc pro tunc order to correct the judgment entry").

The trouble with the State's argument is that the court's oral pronouncement of sentence included adjudication of guilt and entry of judgment on each count as well as imposition of sentence on each count, only after which the court noted the counts would merge and implied merger would apply to the sentences only. In its written sentencing order, the court also adjudicated LuCore guilty of and imposed sentence on each count, although it later noted merger would apply "for purposes of sentencing." So the court's oral pronouncement of judgment and sentence and

written order of disposition are, in reality, consistent, except as noted above. Both were erroneous for entering judgment on the two counts that should have merged with others. And "[a] nunc pro tunc order can only be used to correct an order to show what really happened, not to correct a legal error or a mistake." *State v. Jackson*, No. 17-1816, 2018 WL 6706216, at *1 (Iowa Ct. App. Dec. 19, 2018).

But we also do not find LuCore's request for resentencing is the appropriate remedy. After all, the district court reached its ultimate sentencing decision with merger in mind. Consequently, we simply vacate the convictions, judgments, and sentences on counts one and two, which the parties and court agreed would merge with other counts at the sentencing hearing, and we remand for the entry of a corrected judgment and sentencing order consistent with this opinion.[8] *See State v. Anderson*, 565 N.W.2d 340, 344 (Iowa 1997); *State v. Jandreau*, No. 13-0031, 2014 WL 667690, at *6 (Iowa Ct. App. Feb. 19, 2014); *State v. Soni*, No. 11-1480, 2012 WL 3200852, at *5 (Iowa Ct. App. Aug. 8, 2012); *see also State v. McLachlan*, 880 N.W.2d 513, 516 n.5 (Iowa Ct. App. 2016) (discussing the utility of corrected sentencing orders being issued by the district court even though the appellate court has finally resolved the issue).

C.    Consistency of Verdicts

Finally, we address LuCore's argument that the verdicts are inconsistent because his convictions of homicide and serious injury by vehicle, which involve

---

[8] It does appear that the written sentencing order's statement that count four would merge into count two rather than the other way around as stated at the hearing was indeed a scrivener's error.

recklessness and unintentional harm, are incompatible with his convictions of willful injury and murder, which involve specific intent and malice aforethought.

Sidestepping the serious error-preservation concern that appears to be an issue of first impression,[9] we agree with the State that the issue is moot[10] given our findings that the evidence is sufficient to support the general and specific intent crimes of second-degree murder and willful injury, and the reckless and unintentional crimes of homicide and serious injury by vehicle merge with second-degree murder and willful injury causing serious injury. Furthermore, lower findings of reckless or unintentional culpability do not negate findings of specific and general intent to an extent they are legally inconsistent. *See State v. Perry*, No. 15-1949, 2017 WL 936092, at *3 (Iowa Ct. App. Mar. 8, 2017).

---

[9] From the outset of his argument, LuCore agrees "[t]he issue of 'inconsistent verdicts' was not explicitly raised in the district court" but notes caselaw does not "address what is minimally required to preserve error on this issue." Because this was a bench trial, LuCore relies on the rationale underlying the exception to the error preservation requirement for challenges to the sufficiency of the evidence and argues "error need not be preserved on a claim of inconsistent verdicts because in a bench trial the court is solely responsible for finding facts and reaching conclusions of law." *Accord State v. Abbas*, 561 N.W.2d 72, 73–74 (Iowa 1997) (holding that "when a criminal case is tried to the court, a defendant may challenge the sufficiency of the evidence on appeal irrespective of whether a motion for judgment of acquittal was previously made" because "[t]he purpose of such a motion is to provide the court with an opportunity to ensure that there is sufficient evidence to support the submission of the case to the jury which serves as the fact finder" whereas, "[i]n a bench trial, the court is the fact finder and its finding of guilt necessarily includes a finding that the evidence was sufficient to sustain a conviction").

The State responds that error was to be preserved by the filing of a motion for a new trial alleging the verdicts were "contrary to law or evidence."

[10] LuCore did not respond to the State's mootness claim in his reply brief.

**IV.     Conclusion**

We affirm LuCore's convictions and sentences on counts three through seven—second-degree murder, willful injury causing serious injury, and three counts of willful injury causing bodily injury.  We vacate his convictions and sentences on counts one and two—homicide and serious injury by vehicle.  We remand for the entry of a corrected judgment and sentencing order consistent with this opinion.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**